[Crim. No. 5852.   Second Dist., Div. Three.   Nov. 15, 1957.]

THE PEOPLE, Respondent, v. ILLIE STONE et al.,
Appellants.

Glenn C. Garman for Appellants.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Roy A. Gustafson, District Attorney (Ventura), and Elwood R. Walls, Deputy District Attorney, for Respondent.

WOOD (Parker), J.—By information Number 2664 defendants Stone and Thomas were charged in Count I with conspiring to commit theft; in Counts II and III with burglary; and in Count IV with theft of personal property of a value not in excess of $200. It was also alleged therein that Stone had been convicted of burglary; and that Thomas had been convicted of violating section 2593(a), title 26, of the United States Code, a felony (failing to pay a tax on marihuana).

By information Number 2676, as amended, the defendants were charged in two counts with violating section 506a of the

Vehicle Code. In Count I they were charged with driving an automobile upon a highway while they were addicted to the use of narcotic drugs. In Count II they were charged with driving an automobile upon a highway while they were under the influence of narcotic drugs. It was also alleged in said information Number 2676 that the offenses charged in the two counts therein and the offenses charged in all the counts in information Number 2664 were connected in their commission. It was also alleged in the second information (2676) that each defendant had been previously convicted of a felony (the same felonies as alleged in the first information).

Defendants admitted the allegations as to prior convictions.

Over the objection of defendants, the two informations were consolidated for trial. In a jury trial the defendants were convicted on all counts. They appeal from the judgments, the order denying their motion for a new trial, and the order consolidating the informations for trial.

Appellants contend that the evidence does not support the verdicts; the court erred in consolidating the causes for trial; and the deputy district attorney was guilty of misconduct.

On August 5, 1956, about 3 p. m., the defendant Thomas registered at the Ventura Hotel in Ventura for himself, the defendant Stone, and a woman. The registration as written by him was "Mr. and Mrs. Illie Stone and Joe Brown."

On August 6, 1956, about 1:30 a. m., Officer Gibson observed an automobile, without lights, which was being driven on a street in Ventura. He stopped the automobile. Stone was the driver, and Thomas and a woman were also in the automobile. The officer testified that Stone and Thomas appeared to be intoxicated; their speech was slow, but there was no odor of alcohol. He did not arrest them. Thomas was the owner of the automobile which was a 1941 Chevrolet.

About 4:15 p. m. on August 6, the defendants took their baggage from the hotel. Thereafter they went, in the Chevrolet, to Oxnard and drove around in that city.

Between 7:30 and 7:45 p. m. on August 6, the defendants went into the La Victoria Market in Oxnard. At that time a girl, 17 years of age, was at the cash register, and her uncle, who was the manager of the store, was also in the store. The defendants looked around in the store about three minutes, and then Thomas called the manager to the back of the store and asked him for sardines in oil. When the manager showed him the sardines Thomas said that he wanted sardines in

tomatoes. After the conversation about the sardines had continued about one or two minutes, Thomas took the sardines in oil and went to the cash register and paid for the sardines. While Thomas was negotiating for the purchase of the sardines, Stone took a 29-cent loaf of bread to the girl at the cash register and gave her a twenty-dollar bill. The girl gave him $19.71 in change. Then Stone asked her to change five "1's" for a five-dollar bill. He gave her the five "1's" and she gave him a five-dollar bill. Then Stone, while holding two five-dollar bills in his hand, asked her to give him a "10" for two "5's." She gave him a "10" but, according to her testimony, he did not give her two "5's." Then Stone asked her to change the "10" and the two "5's" for a twenty-dollar bill. She made the exchange, and then Stone left the store.

The sardines counter was about 25 feet from the cash register. The manager of the store testified that while he and Thomas were talking about the sardines he (manager) noticed that the girl went to the cash register three or four times; he was watching the girl, who was at the cash register, because the persons in the store (defendants) were strangers. After the defendants left the store the girl and the manager checked the cash register and found that the register was $10 short. The manager telephoned the police.

About 8 p. m. on August 6, the defendants went into the La Barga Market in Oxnard. At that time Lupe Rivera (a 16-year-old boy) and Mrs. Gamboa, who were employees of the store, were in the store. Thomas asked Mrs. Gamboa where the sardines were. She went with him and showed him where they were. He asked for sardines in tomato sauce. She replied that she did not have that kind. He asked for sardines in mustard. She said that she did not have that kind but did have sardines in oil. He said that he did not know whether he should take that kind. He kept talking about how he hated to shop for groceries for his wife. Mrs. Gamboa noticed that Lupe, who was at the cash register counter, was busy and that a man was there. Mrs. Gamboa left Thomas and proceeded toward the counter. As she approached the counter the man, whom she identified as Stone, left the store. While Thomas was negotiating for the purchase of sardines, Stone took a can of pork and beans, went to the cash register counter, and handed Lupe a ten-dollar bill. Lupe gave him change, which was 79 cents, four "1's" and a "5." Then Stone asked him if he needed any change

for other customers. He said, "Yes." At that time Stone had nine "1's" and a "5." Lupe told Stone to put the "5" away and give him a "1" so that would make $10 even. Stone gave him ten "1's," and Lupe gave Stone a "10." Then Stone asked Lupe for "the other" ten-dollar bill. Lupe said that he had just given it to him (Stone). Stone asked for the bill "about twice," but when Mrs. Gamboa approached the counter Stone said that Lupe was right and that he (Stone) would not try to cheat him. Then Stone left the store. Thomas also left the store.

About 8:25 p. m. on August 6, the defendant Thomas drove his Chevrolet automobile into a gasoline station in Port Hueneme. Stone was also in the automobile. Thomas got out of the automobile and told Mr. Miller, the station attendant, that he wanted 80 cents worth of gasoline. The attendant put that amount of gasoline in the automobile. Stone asked the attendant about deer hunting and how much the license would cost. Thomas gave the attendant a five-dollar bill and then went with the attendant to the register. The attendant gave Thomas change which was four nickels and four one-dollar bills. Then Thomas said, "You might need that to make change with." Thereupon Thomas handed four "1's" to the attendant and said, "Just give me a '5' for those and you will have them to make change." The attendant handed a five-dollar bill to him. Then Thomas, who had that "5" and another "1," said "Well, you might need to make change for a '10' so just take this '6' and '4' and give me a '10' and then you will have change to make for a '10'." The attendant gave him a "10" for the "5" and the "1," but Thomas did not give him the other $4.00. Thomas entered the automobile and drove away. After the defendants had gone, the attendant "figured it out" on paper, found that he had lost $5.00 and then he telephoned the police.

Officer Hall, a detective, received a radio call about 7:50 p. m. on August 6, and as a result of that call he went to the La Victoria Market, arriving there about 7:55 p. m. He took a brief report from the manager. After staying there about three or four minutes he began a search of the immediate area in an attempt to locate the men. He drove around the block and went to the La Barga Market. He arrived at that market about 10 minutes after he arrived at the La Victoria Market.

About 9 p. m. on August 6, Officer Valentine observed the Chevrolet automobile in Oxnard and at that time the automobile was being driven by Stone. The officer stopped the

automobile and arrested the defendants. He arrested them as a result of a radio broadcast. The officer testified that Stone talked very slowly and seemed to be in a daze, and that his eyes were glassy and dilated.

Officer Hall testified that he had a conversation with Stone about 9:10 p. m. at the police station; Stone appeared to be in a stupor but there was no odor of alcohol; Stone's eyes were pinpointed and glassy. The officer testified further that in the course of his work as an officer he had studied the methods used by narcotic addicts and he had seen hundreds of persons who were under the influence of narcotics; he saw puncture marks on Stone's arms, and many of the marks appeared to be old but two or three of them appeared to be fairly fresh; Stone appeared to be under the influence of narcotics.

Mr. Belanger, a medical laboratory technician, testified that in the course of his work he had seen many persons who were under the influence of narcotics; he examined Stone about 10:40 p. m. on August 6; the pupils of Stone's eyes were pinpointed and he seemed to have a dazed or relaxed manner; on Stone's arms there were numerous scars and marks which, in the opinion of the witness, were made by hypodermic needles; two or three of the marks were not more than 24 or 48 hours old; most of the marks were dark, and were over a vein area; the vein area for 2 or 3 inches was a scar; such a scar, which is referred to as a "snake," is formed after a long period of time by repeated injections; in the opinion of the witness, Stone was under the influence of a narcotic drug.

Mr. Belanger testified that he examined Thomas about 11:45 p. m. on August 6; the pupils of Thomas' eyes were pinpointed and showed no reaction to light; he was dazed and "over-relaxed"; the witness did not detect an odor of alcohol on Thomas; there were numerous scars and some fresh marks on Thomas' arms; most of the marks were dark and were over a vein area; it would take many repeated injections over a period of more than a year to form such scars; he (witness) analyzed a specimen of Thomas' urine and found that it contained a large amount of morphine derivative; in the opinion of the witness, Thomas was under the influence of a narcotic drug.

Officer White testified that on August 6, about 9:40 p. m. he asked Thomas if he had "taken more money than had belonged to him from Mr. Miller, the gas attendant"; Thomas

said that he did not want to put it (statement) on tape because if he did put it on tape he would go back to jail; Thomas also said that he had pulled "this trick," which he had pulled that night, five or six times during the time he had been up from Los Angeles; the officer asked Thomas if he did not figure that he owed the man some money; Thomas said that he did not want it (statement) on tape, but he would rather give the money back than to have any trouble.

Officer Hall also testified that he saw Stone on August 7, about noon; at that time Stone appeared to be sick; he had his hands on his "stomach" as if he had cramps; he was perspiring, yawning continuously, and his nose was running; in the opinion of the officer, Stone was in a condition known as the "withdrawals," which is a condition wherein a person is "coming off" of the fix of narcotics and needs more" narcotics; Stone said that he was sick and needed "a fix" and that he had a spoon of heroin at a hotel in Ventura; Stone also said that if the officer would let him get a fix from that heroin he would be willing to be arrested and "go" on a possession of narcotics charge rather than on burglary charges.

Officer White also testified that when he saw Thomas on August 7, about 11 a. m., Thomas appeared to be chilled, he had cramps, was vomiting, perspiring, and yawning; his nose was running; in the opinion of the witness, Thomas was in a narcotic withdrawal.

A physician, who was qualified to give an opinion relative to the effects of narcotics upon the human body, testified in response to proper hypothetical questions that in his opinion the persons referred to in the questions were, on August 7, 1956, addicted to the use of a narcotic drug.

Defendant Thomas testified that on August 6, about 8 p. m., he and Stone were in Thomas' 1941 Chevrolet automobile and were driving around in Oxnard; he and Stone went into the La Barga Market and Thomas asked a lady employee for sardines in tomato juice; the lady said that the store did not have that kind but did have sardines in oil; Thomas said that he did not want sardines in oil; then Thomas and Stone left the store and went into the La Victoria Market, and Stone asked a man employee for sardines in tomato juice; the man said that the store did not have that kind; Thomas picked up a can of sardines in oil, went to the cash register, and paid for the sardines; at that time Stone had left the store; when Thomas last saw Stone in the store, Stone was carrying a loaf

of bread toward the counter (register); after leaving that store they went into a gasoline station in Port Hueneme, and Thomas, who was driving the automobile at that time, asked for 80 cents worth of gasoline; the man (attendant) put the gasoline in the automobile, and Thomas gave him a five-dollar bill; the man gave Thomas $4.20 in change; then Thomas asked the man to take "this 5" and a "1" and four "1's" and then to give Thomas a ten-dollar bill; the man did that; after leaving the station they stopped and changed drivers, and Stone was driving at the time the officer stopped them and made the arrest.

Thomas also testified that he had used narcotics, and the last time he had used them was about July 20, 1956; he had not taken any narcotic within a week prior to August 6, 1956; he was convicted in Texas of a felony; the felony was the failure to pay a federal tax (apparently a tax on 118 pounds of marihuana). On cross-examination he testified that he was last employed in 1955; the total time he had used narcotics was about 15 months, but that was not the preceding 15 months; he first used heroin in 1952, and he used it once or twice a week for six months; after that six months he was in jail for 14 months; he started using narcotics again in September, 1954, and he used them two or three times a week until November, 1954; in that month he pleaded guilty to a charge of being a narcotic addict, and thereafter he was in jail; he started using narcotics again in May, 1955, and used them about 10 days; thereafter he was in jail; he started using narcotics again in July, 1955, and used them until October, 1955; in that month he pleaded guilty to a charge of being a narcotic addict, and thereafter he was in jail until July, 1956; he started using narcotics again about the middle of July, 1956, and stopped using them about July 20, 1956; he has known Stone about nine years.

Defendant Stone testified that on August 6 he and Thomas went into La Barga Market; that was the first market they entered that evening; Thomas went to the canned goods department; Stone got a can of pork and beans, went to the counter and gave the "young fellow," who was the cashier, a five-dollar bill; the cashier gave Stone the change; then Stone asked the cashier if he wanted the "change back"; Stone gave the cashier five "1's" for a "5"; Stone asked him if he wanted a "5" and five "1's" for a "10"; the cashier seemed to get confused, and Stone said "I am sorry you got mixed up"; then Stone left the store; Thomas did not have

anything when he left that store; then Stone and Thomas went into the La Victoria Market; Stone got a loaf of bread, went to the cash counter, and gave the lady a twenty-dollar bill, and she gave him the change; then he said he had a bunch of ''1's'' and that he did not want to take the change from her; he asked if she needed the change; he gave her a ''5'' and five ''1's'' and she gave him a ''10''; he gave her two ''10's'' for a ''20,'' and he left the store; then Stone and Thomas went to Port Hueneme and stopped in a service station; Thomas got out of the car and bought some gas; Stone stayed in the car and talked to the attendant about deer hunting; thereafter when they were driving into Oxnard they were arrested; at the police station Officer Hall asked him about using narcotics, and he replied that he had used narcotics ''a long time back''; the officer asked about the marks on his (Stone's) arms, and Stone replied that they came from a skin rash; he (Stone) had withdrawals in 1950 but has not had any withdrawals since that time.

The argument of appellants, regarding the alleged insufficiency of the evidence, is to the effect that the girl, who was cashier at the La Victoria Market, was confused regarding the exchange of money, and there were inherent improbabilities in her testimony; that no crime was committed at the La Barga Market—it was not claimed that any money was wrongfully taken at that place, but the only incident there was that some discussion was had regarding change, and when the misunderstanding was called to Stone's attention he apologized and left the store; that the attendant at the gasoline station, who admitted that he was confused, did not know that he had lost $5.00 but he concluded that he lost that amount; that there were inconsistencies in the testimony of Officer Hall; the hypothetical questions, which were asked the physician, were based upon facts not in evidence; the opinions of the medical laboratory technician were based upon a cursory examination of defendants and were speculative. That argument relates to the credibility of the witnesses and the weight to be accorded to their testimony. Such matters were for the determination of the jury. Even though no money was taken wrongfully at the La Barga Market, there was a question of fact for the jury as to whether the defendants entered that store with intent to commit theft therein.

Burglary is committed if a person enters a store with the intent to commit theft therein. (Pen. Code, § 459.) In

determining the question of intent with reference to entering the La Barga Market, the similarity of the methods used by defendants in the two stores was of significance. ■ Thomas engaged the adult person in each store in conversation about purchasing a kind of sardines which was not available, while Stone was engaging the cashier in each store, who was a minor, in complicated change transactions in paying for a low priced article. Stone, after paying for a can of beans by presenting a five-dollar bill and receiving change therefor, indicated he was solicitous regarding the boy's supply of change for other customers, and thereupon he initiated the further exchange of bills. The similarity of the transactions and the further evidence that Stone asked twice for ''the other ten,'' when the ''ten'' had already been given to him, and the further evidence that Thomas had purchased sardines before they entered the La Barga Market, indicate an intent to commit theft in the La Barga Market. As to the other crimes alleged, it is not necessary to discuss the evidence which is stated above in some detail. The argument of appellants, with reference to insufficiency of the evidence, pertains to questions of fact. The evidence was sufficient to support the verdicts.

■ Appellants contend further that the court erred in consolidating the two informations for trial. As above stated, it was alleged in the second information that the offenses charged in the two informations were connected in their commission. Appellants argue that the offenses charged in the informations were not connected in their commission, that there was no common element of substantial importance in their commission, and that reference in the consolidated trial to narcotics was prejudicial to the defendants on the charges of conspiracy, burglary, and theft. Section 954 of the Penal Code provides, in part: ''An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. . . .'' In *People* v. *Scott*, 24 Cal.2d 774 [151 P.2d 517], it was said at pages 778 and 779: ''As it now reads the statute [section 954] permits the joinder of different offenses, even though they do not relate to the same transaction or event, if there is a common element of substantial importance in their commission, for

the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.'' In the present case a common element of substantial importance in the commission of the crimes charged in both informations was the use of the automobile. Of course, the use of the automobile was essential in the commission of the crimes charged in the second information, namely: that defendants drove an automobile while they were under the influence of narcotics and while they were addicted to the use of narcotics. The use of the automobile was of substantial importance in the commission of the crimes charged in the first information, namely: conspiracy to commit theft; burglary; and theft. The overt act alleged, with reference to the conspiracy, was that defendants went to the La Victoria Market in Oxnard. The evidence with respect to the conspiracy included evidence as follows: the defendants, who had been friends about nine years, were guests at the hotel in Ventura; on August 6, about 1:30 a. m., they were in Thomas' automobile in Ventura and they were stopped and questioned by a police officer; on August 6 they went from Ventura to Oxnard and Port Hueneme in the automobile, and they returned to Oxnard in the automobile; on that automobile trip they went to the La Victoria Market and the La Barga Market in Oxnard where the burglaries, involving similar methods and ''short-change tricks,'' were committed, and they went to the service station in Port Hueneme where the theft, involving a ''short-change trick,'' was committed; the burglaries and the theft, at those different places and cities, were committed within a period of approximately an hour; during that trip each defendant drove the automobile part of the time; defendants were in the automobile when they were arrested in Oxnard which was about 30 minutes after they left the service station in Port Hueneme. The automobile was a principal factor in the transaction whereby theft was committed at the service station. Defendants went into the station in the automobile, ordered a small amount of gasoline for it, and then Stone, who remained in the automobile, carried on a conversation with the intended victim (attendant) about deer hunting, while Thomas performed the short-change trick. When defendants left the station, Thomas (the short man) was driving but thereafter defendants changed drivers, and Stone (the tall man) was driving when an officer stopped the automobile (about 30 minutes later) and arrested the de-

fendants. Material evidence on behalf of the prosecution, with respect to the charges in both informations would include the circumstances prevailing at the time of and soon after the arrest, such as the appearance, statements, conduct, and location of the defendants. Such circumstances, under any of the charges, would include the evidence that defendants were in the automobile, they seemed dazed, the pupils of their eyes were pinpointed, they had fresh marks on their arms, Stone's eyes were glassy and his speech was very slow. It thus appears that the use of the automobile was a common element of substantial importance in the commission of the crimes charged in both informations, and that if the informations had not been joined for trial there would have been repetition of much of the evidence.

The People assert that a further common element of substantial importance in the commission of the crimes charged in both informations is that the defendant allegedly were narcotic addicts. Of course, addiction to the use of narcotics was a principal element in the crimes charged in the second information, namely, driving an automobile while addicted to and under the influence of narcotics. The People argue, with respect to the charges in the first information (conspiracy to commit theft; burglary; and theft), that proof of addiction to the use of narcotics, with the resultant craving for them, might establish a motive on the part of defendants to commit the crimes, that is, a motive to obtain money for the purchase of narcotics. In view of the above conclusion relative to the use of the automobile, it is not necessary to decide this question regarding motive.

The court did not err in consolidating the two informations for trial.

■ Appellants contend further that the deputy district attorney was guilty of prejudicial misconduct for the reasons (1) that during his cross-examination of Thomas he referred to and used partial transcripts of Thomas' previous testimony, and (2) that such transcripts were prepared without notice to defendants and copies were not furnished to them, and they did not have an opportunity to determine whether the transcripts were correct. They argue that the purpose and effect of such use of the partial transcripts was to create an impression that the deputy's questions were based upon a transcript of Thomas' previous testimony and that Thomas was not telling the truth. When counsel for defendants noticed that the deputy was referring to a transcript he

(counsel for defendants) asked if the deputy was referring to a daily transcript of the proceedings. The deputy replied that he had asked the reporter to type up ''Thomas' examination.'' Counsel for defendants said that he would object to the use of the daily transcript unless defendants were furnished a copy. The deputy replied that neither the People nor the defendants had asked for a daily transcript and he knew of no law that required him to get the consent of counsel for defendants before he asked the reporter to type a portion of what had been said. The objection was overruled. This contention is not sustainable.

Appellants contend further that the deputy district attorney was guilty of prejudicial misconduct in that he asked Thomas if he had been convicted of being a narcotic addict in 1954. Prior to asking that question, Thomas had testified that he was not a narcotic addict in 1954. Counsel for defendants objected to the question, and the objection was sustained and the jury was instructed to disregard it. ■ Thereafter the deputy district attorney asked Thomas whether or not on November 19, 1954, he admitted by way of pleading guilty that he was a narcotic addict. Defendants' objection to the question was overruled. Thomas replied in the affirmative. The deputy asked Thomas if he was a narcotic addict on October 26, 1955. Thomas said he was not. Then the deputy asked him if he admitted on or about October 26, 1955, by pleading guilty that he was an addict. Defendants' objection to the question was overruled. Thomas replied that he entered a plea of guilty but he did not admit the use of narcotics. Appellants argue to the effect that their prior bad acts were not relevant to their guilt or innocence of the present charges, and that since prior misdemeanor convictions may not be referred to for impeachment purposes, the deputy district attorney must have asked the question for the purpose of prejudicing the jury. The prior admissions of Thomas were relevant to the present issue whether Thomas was a narcotic addict when he was driving the automobile, especially in view of Thomas' other admissions, to the effect, that during the intervening time from 1954 to August, 1956, he used narcotics frequently when (during said period of time) he was not in jail. The deputy district attorney was not guilty of misconduct in asking those questions.

■ Appellants also contend that the deputy district attorney was guilty of misconduct in presenting certain testimony on rebuttal. Stone had testified on direct examination

that he had not used narcotics since 1953. He had testified on cross-examination that he did not recall telling an officer on February 21, 1955, that he had a fix of heroin at 11 o'clock on that date; he did not recall that a photograph of his arm was taken on that date; he did not have any fresh needle marks on his arm on that date. As a witness on rebuttal, the prosecution called Officer Robinson who testified that Stone told him on February 21, 1955, that he had a fix at 11 a. m. on that date; that he (officer) was present when a photograph of Stone's arm was taken on February 21, 1955; that on said date he saw some needle marks on Stone's arm, which marks appeared to be fresh. The fact that Stone had said that he did not recall making the statement to the officer, and that he did not recall a photograph, did not preclude the prosecution from presenting the testimony of the officer. (See *Ehat* v. *Scheidt,* 17 Cal.App. 430, 436 [120 P. 49].) The officer's testimony tended to rebut Stone's testimony that he had not used narcotics since 1953. This contention is not sustainable.

█ The order consolidating the informations for trial is not appealable. (Pen. Code, § 1237.) That order is not an order made after judgment.

The purported appeal from the order consolidating the informations for trial is dismissed. The judgments and the order denying the motion for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.