[Crim. No. 7262. Second Dist., Div. Three. Feb. 8, 1961.]

THE PEOPLE, Respondent, v. RUFUS WILLIAMS, Appellant.

(Consolidated Cases.)

32

Cary G. Branch, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

VALLÉE, J.—In one information defendants Rufus Williams and Issiah Cain were accused of burglary. (Pen. Code, § 459.) In a second information they were accused of robbery. (Pen. Code, § 211.) When the cause was called for trial, on motion of the district attorney, the informations were consolidated for trial. A jury found defendants guilty of burglary of the second degree and of robbery of the second degree. Williams, referred to as defendant, appeals from the judgments sentencing him to state prison and from the orders denying his motions for a new trial.

In the evening of December 8, 1959, Officers Martin and Renty of the Los Angeles Police Department, in a prowl car, made an investigation in the vicinity of Vermont Avenue and Adams Boulevard in Los Angeles. They were there because there had been a large number of strong-arm robberies and purse snatchings in the area. They saw defendant, Issiah Cain, Virgil Brown, and James Thomas "han[g]ing out in front of the check cashing window of the market on the southeast corner of Vermont and Adams." The four men appeared to be watching the activity around the window. As the prowl car reached the corner they separated, going in two different directions to the 2700 block on Vermont, and got into a red 1953 Studebaker with license number SHW

408 registered to Cain. The officers stopped the men, questioned them, and made out interrogation cards. An interrogation card lists the name, address, and physical description of the person for filing reference.

About 9:30 p. m. on December 10, 1959, Margaret Gahan was struck on the head as she was walking to her home. She fell to the sidewalk. Two men beat her about the head and face and started to tear off her blouse. One of the men bit her. One took her purse. Her purse contained money, a small notebook, and some papers. Mrs. Gahan screamed and the men ran away. Asked if defendant was one of the men who took her purse, Mrs. Gahan testified: "I am not positive. I am almost sure, but I wouldn't say positively."

About 6 p. m. on December 10, 1959, Michael Collins, a Deputy Sheriff, parked his car on the northwest corner of Union Avenue and Twelfth Place in Los Angeles and left it. In the car he had a brief case containing law books, a slide projector, a case containing about 300 35-millimeter color slides, and a bundle of clean laundry. He returned to the car about 11 p. m., removed some law books, and locked it. The next morning the right wind wing was broken. The slide projector, the slides, and the bundle of laundry were missing.

In the evening of December 10, 1959, Officer Martin was cruising in the same general area. He received a call relative to a strong-arm robbery at 2302 South Vermont, which is near Adams and Vermont. Martin interviewed the victim, George Doors, who gave him detailed descriptions of the robbers and said he had struck one of them in the face. He described the robbers as four males whose heights varied from 5 feet 6 inches to 6 feet 2 inches. The descriptions tallied with the descriptions of the four men Martin had interrogated on December 8.

Officer Martin went to the police station and examined the field interrogation cards made on the four men on the eighth. He obtained a photograph of defendant and returned to the scene of the robbery. He showed the photograph to Doors, who stated it was of one of the four men who had robbed him.

Officers Martin and Renty then went to 5251 South Figueroa Street in Los Angeles, the address defendant had given them on December 8. It was about 1:30 a. m. The address was an apartment house. The red Studebaker which they had seen on December 8 was in the parking lot of the apartment house. The hood was warm. They went to the manager of the house and asked for the location of defendant's

room. The manager told them it was apartment 5. They went to apartment 5, knocked on the door "for five or 10 minutes," and received no response. They returned to the manager, obtained the key, and entered apartment 5. It was a three-room apartment: a living room, bedroom, and kitchen. A man named Cooks was lying on a sofa. In a closet they found a slide projector, slides, and some freshly done laundry. A man named Walker was in the bedroom. Martin asked Walker who owned the slide projector and the laundry. Walker said he did not know anything about them, that defendant and two men he did not know had come in about five minutes earlier, dropped them in the room, and left. Cooks and Walker fitted the descriptions of two of the four men who had robbed Doors.

The officers went back to the Studebaker and under the rear seat found a small address book and a sales slip, both of which bore Mrs. Gahan's name, address, and telephone number. They returned to apartment 5, where they noted a rubber stamp on the slides with the name "M. G. Collins." Cooks and Walker were arrested. The projector, slides, and laundry were taken by the officers. Officer Martin placed a "stake-out" on apartment 5 from about 1:45 to 3 a. m. on the morning of December 11 and went to the police station. He telephoned Mrs. Gahan, who told him she had been the victim of a robbery and gave him the location. About 5:15 a. m. he returned to apartment 5, knocked on the door about 5 or 10 minutes, received no response, obtained the key from the manager, and entered the apartment. Defendant was in bed. Martin arrested him and searched the closet again. He found a freshly laundered shirt with the laundry mark "COL." Martin asked defendant "how he got the swollen and inflamed left eye." Defendant said he had been to a show that evening and "his eye started to bother him in the show and he started rubbing it and it caused an inflammation in his eye." When asked what show he had seen, defendant said he did not know.

About 9:30 a. m. on December 11 Officers Wright and Zeiner had a conversation with defendant. Wright asked him what he had done the day before. Defendant said that about 10 o'clock the night before he had gone down on East Fifth Street; defendant Cain drove up in his red Studebaker; there were two other men in the car he did not know; when he opened the door of the car he saw the projector, the box of slides, and a box of shirts; he got in the car and Cain wanted him to help sell them; they drove around, trying to find a buyer, and decided they would try again the next morning;

all four went to defendant's apartment, showed the slides on the wall, divided the shirts, and had something to eat; he and Cain then started to take the other two men back to East Fifth Street in the Studebaker; as they left the apartment, they saw a police car going by slowly on Figueroa Street; Cain "became frightened and he took off and went over to the back fence"; he waited there five or ten minutes; Cain did not reappear, and he took the other men "home" in his Pontiac; he returned to his apartment and was later arrested. The officer told defendant the merchandise had not been stolen at 10 o'clock but had been stolen at a later time. Defendant said the first time he saw it was about 10 o'clock that night on East Fifth Street; he denied he was involved in the theft of the articles from the automobile.

About noon on December 11 Officer Wright went to the red Studebaker. He did so because defendant had told him they had transported a stolen projector, a case of films, quite a few slides, a vacuum cleaner, and some shirts. He went to search the car to see if there was anything else there.

On December 16, 1959, Officers Wright and Zeiner had a conversation with defendant and Cain. Officer Wright told Cain his story was quite a bit different from defendant's and he would like to have him (Cain) straighten it out; that Cain would have a chance to speak and then defendant would have a chance to speak. Wright asked Cain to tell him what happened on December 10. Cain told this story: He had been to defendant's house about 5 to 7 o'clock. They drove on East Fifth Street and took a girl home. They picked up "a couple of studs," known only to defendant. While they were drinking wine in the back seat of the car, the two men said that if they had a car like his they could really make some money. They asked him if he was willing to let them use the car and he said yes. They drove around the downtown area. At one point the other men got out and returned shortly. Later defendant and one of the "studs" got out of the car and were gone 10 or 15 minutes and came back carrying a purse. Defendant interrupted Cain's story asking, "Who was carrying the purse?" Cain said, "The other fellow had the purse."

Cain continued: Defendant said, "Let's get away from here quick." They drove six or eight blocks and threw the purse out. At another point defendant and the two "studs" left the car and were gone five or ten minutes. When they got back, one of them said they had "strong-armed" an old man on the street but they did not get anything because all he had

was keys. They stopped again. Defendant and one of the "studs" got out. They were gone five or ten minutes. When they returned one of them said they had "strong-armed" another man. They stopped in the vicinity of Pico and Union. Defendant got out with one of the "studs." They were gone a few moments, returned, defendant asked for a screwdriver which he gave them, and they left again. Defendant interrupted Cain inquiring, "Who asked for the screwdriver?" Cain replied, "The other man." Cain continued: When they came back they had the projector, the slides, and the clothes. They took the articles to defendant's apartment, showed the slides, and had something to eat. They decided to take the "studs" back to East Fifth Street. On the way to the red Studebaker, he saw a police car cruising by. He "got scared" and went over the back fence. He was gone about 15 minutes. When he returned, defendant, the "studs," and defendant's car were gone. He tried to start his car; it would not start. He left it and walked home, where he spent the night. The next morning at a doughnut shop he overheard a man say, "the red Studebaker is hot." He went to the car, started it, drove it to the area of East Fifth Street "and decided to let my friend use it for a couple of days while I went to Santa Barbara."

After Cain concluded his story as related above, Officer Wright left the room and listened to further conversation between Officer Zeiner, defendant, and Cain on a loudspeaker. Defendant said to Cain, "You know I didn't throw that purse out of the car." Cain replied, "No, it was the other man."

The informations were consolidated over defendant's objection. He asserts prejudicial error. "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (Pen. Code, § 954.) ▇ Section 954 has been construed to permit consolidation where there are two or more different offenses connected together in their commission; where the different offenses grow out of the same transaction; and where the offenses are of the same class. (*People* v. *Renier,* 148 Cal. App.2d 516, 518-519 [306 P.2d 917].) ▇ The consolidation of charges is proper where there is a common element of substantial importance in the commission of the offenses. It is not essential that the two offenses should have been aimed

against the same person. (*People* v. *Kramer,* 103 Cal.App.2d 35, 39 [229 P.2d 53].)

In *People* v. *Stone,* 155 Cal.App.2d 259 [318 P.2d 25], the defendants were accused in one information with conspiracy to commit theft, burglary, and theft; in another they were accused of driving an automobile while addicted to the use of narcotics and of driving an automobile while under the influence of narcotics. The informations were consolidated. This court stated (p. 268):

"In *People* v. *Scott,* 24 Cal.2d 774 [151 P.2d 517], it was said at pages 778 and 779: 'As it now reads the statute [section 954] permits the joinder of different offenses, even though they do not relate to the same transaction or event, if there is a common element of substantial importance in their commission, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.' In the present case a common element of substantial importance in the commission of the crimes charged in both informations was the use of the automobile."

*People* v. *Pianezzi,* 42 Cal.App.2d 265 [108 P.2d 732], held that it was not an abuse of discretion for the trial court to consolidate charges against two different defendants involving bank robberies of which two were committed by both and a third person on one occasion in one bank, and the other was committed by one defendant with three others in a different bank. ██ A motion for consolidation is addressed to the discretion of the trial court; and in the absence of a showing of prejudice, of which there is none at bar, an order granting the motion will be upheld by a reviewing court. (*People* v. *Morgan,* 134 Cal.App.2d 97, 98 [285 P.2d 336].)

██ The use of the red Studebaker to facilitate quick getaway from the scenes of the offenses charged in the two informations was a common element in the commission of them and warranted consolidation.

██ There was some evidence against Cain alone. We find no error in the court's refusing to sever the trials of defendant and Cain because of that fact. The trial judge was meticulous on each occasion that evidence applied to Cain alone to admonish the jury that the particular evidence was not binding on defendant. (*People* v. *Andrews,* 165 Cal. App.2d 626, 635-636 [332 P.2d 408].)

██ The entries by the officers into defendant's apartment and the search of Cain's automobile were made without a warrant. It is claimed the searches were illegal. The point

has no merit. Prior to entering the apartment the officers had reasonable cause to believe defendant and Cain had committed a felony and to arrest them. (*People* v. *Vice,* 147 Cal. App.2d 269, 274 [305 P.2d 270].) The fact that the searches preceded the arrest is of no consequence. (*People* v. *Luna,* 155 Cal.App.2d 493, 494-495 [318 P.2d 116].) Further, the officers obtained the key to the apartment from the manager of the apartment house before entering. In *People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469], it was held that whether the defendant was in fact a tenant, servant or guest of the owner, the latter had a right to authorize a search when he believed he had at least joint control of the premises; that under such circumstances, the officers were justified in concluding that the owner had the authority he purported to have, and hence there was nothing unreasonable in the officers acting accordingly. The court concluded that the evidence obtained under such circumstances ". . . cannot be excluded merely because the officers may have made a reasonable mistake as to the extent of the owner's authority." (P. 783.) This conclusion was quoted with approval in the later case of *People* v. *Caritativo,* 46 Cal.2d 68, 73 [292 P.2d 513]. The officers were warranted in believing the manager had a right to authorize their entry into the apartment. The searches were legal.

The conversation of December 16 between Officers Wright and Zeiner, Cain, and defendant was admitted over defendant's objection. He asserts that what Cain said was hearsay and the ruling was error.

In the course of Cain's story defendant interrupted, asking: "You know I didn't bring that purse to the car." The jury could reasonably infer from this statement that defendant had been with the other man and that they had robbed Mrs. Gahan. At another point defendant interrupted Cain, inquiring: "Who asked for the screwdriver?" The jury could reasonably conclude from this question that defendant was with the man who asked for the screwdriver and that they used it to pry open the wind wing of Mr. Collins' car and had stolen the projector, slides, and laundry. It could be inferred from defendant's denial of two specific statements made by Cain and his failure to deny the other accusatory statements that he acquiesced in the remainder of the story.

*People* v. *Davis,* 43 Cal.2d 661 [276 P.2d 801], says (p. 670): "Defendant's responses to accusatory statements may find their way into the record only under the admission exception to the hearsay rule. If the accused person expressly

admits the truth of the accusatory statement, both the statement and answer may be admitted. ██ If the accused person expressly denies the accusatory statement, there is no admission. ██ If the accused makes an evasive or equivocal reply which is not directly responsive to the accusatory statement, or remains silent, it has been held that under certain circumstances both the accusatory statement and the response are admissible. ██ In any event, when the accusatory statement is admitted, it is not admitted as proof of the facts asserted in the statement. Such statements are admitted only to show the reaction of the accused. (4 Wigmore on Evidence (3d ed. 1940), §§ 1071, 1072, pp. 70-89.)

██ "When the response to an accusatory statement consists of evasion, equivocation or silence, 'It is for the court in the first instance to determine whether the import of the statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if he did not do so, such failure showed criminal intent or a consciousness of guilt.' "

"The general rule with respect to accusatory statements is that nothing can be admitted into evidence where there was a flat denial. However, the rule is otherwise when the response is other than a flat denial and where the replies made are equivocal or evasive." (*People* v. *Carmelo,* 94 Cal.App.2d 301, 307 [210 P.2d 538].)

██ Defendant says it was error to admit the conversation because he was never given a chance to speak before the police officers left the room. It was Cain, not the police, who was making the accusatory statements. The record shows that defendant had ample opportunity to deny any statement made by Cain. Further, the court gave the instruction quoted in the margin.[1] The court did not err in admitting the conversation of December 16.

----

[1] "If you should find from the evidence that there was an occasion when a defendant, under conditions which fairly afforded him an opportunity to reply, failed to make denial [, or made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to him or made in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature, such [silence] [and] [or] [conduct] on his part may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose

 The court gave this instruction: "All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with criminal intent aid and abet in its commission or, whether present or not, who advise and encourage its commission, are regarded by the law as principals in the crime thus committed and are equally guilty thereof."

Defendant says that after giving this instruction, the court should have defined "aid and abet" to the jury. There was no request for such an instruction. The court was not required to define "aid and abet" in the absence of a request. (48 Cal.Jur.2d, § 462, p. 472.) " 'Where an instruction on a particular point or points as given by the court is correct as far as it goes, and the only valid objection, if any, to it is that it is deficient or inadequate by reason of its generality, indefiniteness, or incompleteness, if defendant desires additional, amplified, explanatory, fuller, or more complete, elaborate, comprehensive, definite, specific or explicit instructions on such point or points, he must properly request the same, otherwise error cannot be predicated upon the failure to give such additional instruction.' " (*People* v. *Reed,* 38 Cal.2d 423, 430 [240 P.2d 590].) The instruction given told the jury that defendant must "knowingly and with criminal intent" have aided and abetted in the commission of the offenses.

 The court gave three instructions on circumstantial evidence which are copied in the margin.[2] Defendant

---

of proving its truth, but only to explain the conduct of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement."

[2] "If the evidence in this case [as to any particular count] is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of defendant's innocence, and reject that which points to his guilt.

"You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt."

"I instruct you further that you are not permitted, on circumstantial evidence alone, or when circumstantial evidence is substantially relied on in the People's case, to find a defendant guilty of [any] crime charged against him unless the proved circumstances not only are consistent with

says that after giving these instructions the court should have defined "circumstantial evidence" to the jury. There was no request for such an instruction. The point is so obviously without merit as not to require comment.

 The court refused to give two instructions requested by defendant which are copied in the margin.[3] Defendant asserts error. He says the jury should have been told that a conviction could not be had without proof of the corpus delicti, that is, on an admission or confession alone. There was never any question concerning the corpus delicti of either offense charged. The question was whether defendant was connected with the commission of them. Under the facts it was not error to refuse these instructions.

 It is claimed the court erred in not instructing the jury as to how they should consider stipulations, evidence that had been stricken, statements of counsel, and intimations by questions as embodied in CALJIC Number 2. No such instruction was requested. There was no error. (*People* v. *Smith,* 67 Cal.App. 623, 624 [228 P. 369].)

 The court gave this instruction: "Evidence, if any, that a defendant, on one or more occasions other than from the witness stand, made false, contradictory or misleading statements concerning the charge against him which now is being tried [or that he endeavored to procure false or fabricated evidence to be produced at the trial] may be considered by the jury as a circumstance tending to prove a con-

---

the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion."

"When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

[3] "The guilt of a defendant may not be established alone by any confession or other statement made by him outside of this trial. Before any person may be convicted of a criminal offense, there must be proof, independent of any such statement, that the crime in question was committed, but it is not necessary that such independent proof include proof as to the identity of the person by whom such offense was committed."

"The guilt of a defendant in a criminal action cannot lawfully be established solely by evidence of a confession, or of an admission, or of both, made by him on an occasion or occasions other than this trial.

"Unless from evidence independent of (any) such alleged confessions and (or) admissions, you can and do find that the crime charged to the defendant was committed by someone, you shall not consider for any purpose any evidence of such a confession or admission. That additional evidence, however, need not independently prove, or include proof of, the identity of the person by whom the offense was committed."

sciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given to such a circumstance, and the significance, if any, to be attached to it, are matters for the jury to determine.''

As the instruction appears in the record, the bracketed words are not blocked out. Defendant says it was error to give the instruction. If the bracketed part was in fact read to the jury, it was error to give the instruction since there was no evidence that defendant had endeavored to procure false or fabricated evidence to be produced at the trial. On the record, however, we do not believe the error was prejudicial. This technical error does not warrant a reversal. (Const., art. VI, § 4½.)

The judgments and orders denying new trials are affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied March 3, 1961.