FOURT, J.
 

 This is an appeal by each of the defendants from a judgment of conviction of several counts of grand theft and forgery, and an attempted appeal from an order denying a motion for a new trial.
 

 In an amended indictment filed in Ventura County on November 10, 1965, defendants were jointly charged with committing grand theft in counts I, V, VII, IX, XI, XV and XVII and forgery in counts II, VI, VIII, X, XII, XVI and XVIII. Defendant Parker was individually charged in count III with grand theft and in count IV with forgery. Defendant Ex was individually charged in count XIII with grand theft and in count XIV with forgery. Defendants each pleaded not guilty to the charges against him and in a trial by jury Ex was convicted of grand theft as charged in counts I, V, VII, IX, XI, XIII and XVII and not guilty of grand theft as charged in count XV, and convicted of forgery as charged in counts II, VI, VIII, X, XII, XIV and XVIII, and not guilty of forgery as charged in count XVI. Counts III and IV were dismissed and as to Parker counts XV and XVI were dismissed.
 

 Parker was convicted of grand theft as charged in counts I,
 
 *662
 
 V, VII, IX, XI and XVII and convicted of forgery as charged in counts II, VI, VIII, X, XII and XVIII.
 

 Ex was sentenced to jail for one year as to counts II, VI, VIII, X, XII, XIV and XVIII, the sentence to run concurrently as to each count. Execution of the judgment was suspended and defendant was placed on probation for five years and ordered to pay a fine of $500 on counts II, VI, VIII, X and XII. It was ordered that on counts XIV and XVIII defendant serve three months in the comity jail, the sentence to run concurrently as to each count.
 

 It was further ordered with reference to the counts as to which no sentence or punishment was imposed that the court reserved the power to impose sentence and punishment with respect thereto in the event judgment of conviction for the related transactional offense should be set aside and the punishment therefor rendered nugatory to the end that there would not be double punishment for offenses arising out of the same transaction.
 

 Parker was sentenced to one year in the county jail as to counts II, VI, VIII, X, XII and XVIII, the sentence to run concurrently as to each count. Execution of the judgment was suspended and defendant was placed on probation for five years, ordered to pay a fine of $500 each on counts II, VI, VIII, X and XII, and, with respect to count XVIII, defendant to serve a period of three months in the county jail.
 

 It was further ordered with reference to the counts as to which no sentence or punishment was imposed that the court reserved the power to impose sentence and punishment with respect thereto in the event judgment of conviction for the related transactional offense should be set aside and the punishment therefor rendered nugatory to the end that there would not be double punishment for offenses arising out of the same transaction.
 

 A timely notice of appeal was filed.
 

 A résumé of some of the facts is as follows: For several years defendants were employed as salesmen for Pezzner Construction Company (sometimes hereafter referred to as Pezzner) engaged in selling aluminum siding for houses. During this time finance companies purchased contracts from Pezzner which had been made and entered into by defendants with various victims. The finance companies required, among other things, that a trust deed be obtained from all purchasers of aluminum siding as security in the transaction. Pezzner had no affiliation with Aluminum Company of America
 
 *663
 
 (ALCOA) nor did such last-mentioned company engage door-to-door salesmen in their business. The defendants knew that a signature on a trust deed secured from the purchaser of the siding would have to be exactly as such signature appeared on other recorded documents.
 

 The Kins father transaction
 
 (counts XVII and XVIII):
 

 The Kinsfathers were contacted by defendants on about October
 
 22,
 
 1963. Parker entered the Kinsfathers’ house first and introduced himself as a representative of ALCOA. Parker stated that he wanted to put aluminum siding on the Kins-father home and make it a showplace for the area. Parker further stated that he had an important representative of a larger company waiting outside in a car and that he would like to bring this important representative into the house if the Kinsfathers were at all interested. Parker brought Ex into the house and introduced him as “Mr. Seymour” a “direct representative of Alcoa Aluminum Company.” Each defendant told the Kinsfathers that any money problems they might have would be avoided because their home would be used as a model home and that in return there would be a special discount price to them for the siding. The Kinsfathers agreed to the proposed purchase and signed the papers which were presented to them in a stack, or sheaf. Ex made an “x” mark where he wanted the Kinsfathers to sign and he also asked them for a legal description of their property, explaining that he needed the description to the end that he could fill out the work order properly. Each of the defendants wrote on the various documents and they took turns in the sales representations to the Kinsfathers. Neither defendant ever mentioned anything about a deed of trust. As the Kinsfathers signed the documents on top of the stack Ex lifted the top papers so that only the bottom corners of the papers below were visible to the Kinsfathers. Ex directed them to sign on the lines indicated and as they signed the documents below they believed they were signing copies of the papers which were on top of the stack.
 

 Mrs. Kinsfather asked defendants if they would leave the documents with them and come back in a few days and get them because of the lateness of the hour. Defendants refused to leave the documents. The Kinsfathers, in the course of events, unwittingly and unknowingly had signed a deed of trust to their property and they would not have done so had they realized that the signing of a deed of trust was a part of the transaction in the purchase of the siding.
 

 
 *664
 

 The Edwards transaction
 
 (counts XIII and XIV) :
 

 Ex contacted Mr. and Mrs. Edwards in September 1963. Ex introduced himself as “Mr. Seymour” a representative of Alcoa Aluminum and represented that the Edwards home would be used as a model home for advertising purposes. A price of $3,600 was quoted by Ex as the total price (including interest) for the siding. Later the actual price was determined to be $5,364.24. Ex presented certain papers in a stack, or sheaf, to the Edwards for signature and stated that the papers constituted a purchase order and that the extra pages were copies which he needed for his company, the finance company and himself. Ex placed “x” marks on the signature lines and directed the Edwards to sign on the lines so marked. No mention was made of any trust deed. Among the papers signed by the Edwards was a trust deed which they would not have signed had they realized the document was a deed of trust or that the total price was $5,364.24.
 

 The Holland transaction
 
 (counts I and II) :
 

 Defendants contacted the Hollands in December 1962. Parker came to the door first and introduced himself as a representative of ALCOA. Parker later brought in Ex who was introduced as “Mr. Seymour,” the head salesman for ALCOA. Both defendants talked and spoke of using the Hollands’ house as a model home and a special price was to be made because of the use of their home for advertising purposes. The price agreed upon was $2,850 and the later determined actual price of $4,525 was never mentioned. Defendants asked to see the deed to the Helland home, stating that they had to determine whether the Hollands actually had a deed or whether they were in possession under a contract of sale. The Hollands then signed several papers in a stack, or sheaf, which Parker referred to as a purchase order form. After the top, or first, document was signed defendants asked them to sign the “copies” below because the carbon paper was not good and the signatures had not penetrated to the papers below. Ex turned the bottom of each paper up so that the lower portion only of the paper was exposed. Neither defendant ever mentioned anything about a deed of trust. The Hollands, in the signing procedure, had signed a deed of trust to their home and had they realized that any of the papers was such a document, they would not have signed the same.
 

 The Buss transaction
 
 (counts IX and X) :
 

 Defendants contacted Mr. and Mrs. Buss in January 1963. Ex used the name of “Mr. Seymour.” The Buss’ agreed to
 
 *665
 
 purchase siding and to accept a loan of $1,875 from Pezzner. Defendants told the Buss’ that the total price, including the loan, would be $4,700. The later determined actual price of $7,463.40 was never mentioned. The papers were arranged in a stack, or sheaf, and Ex placed “x” marks where he wanted Mr. and Mrs. Buss to sign. Ex stood by the Buss’, lifting up each paper as they signed, so that only the bottom portion of the page was exposed. Ex said, “Just sign where the X’s are.” Nothing was ever mentioned about a trust deed. Later Ex learned that the Buss’ had filed an action against the Aluminum Acceptance Corporation, the finance company. Ex then asked Mrs. Buss to call Pezzner and tell them that she lmew that she had signed a deed of trust. Ex stated that he would do something about the interest on the Buss contract if she would call, and said, “If you are good to us, we will be good to you. ’ ’ Mrs. Buss refused to make the call. The Buss ’ would not have purchased the siding had they known there was a deed of trust involved.
 

 The Dick transaction
 
 (counts V and VI) :
 

 Defendants contacted the Dicks in December 1962. Parker came first to the Dick home and explained that their home had been chosen as a model home. Parker later brought in Ex who was introduced as “Mr. Seymour,” a millionaire and a big man in the aluminum siding industry who cared little about profits, but was very interested in giving some people a good deal so that they could display the product. The Dicks agreed to the purchase of the siding for $2,850 and a $1,000 side loan for the Dicks. The actual price was $6,113.52. Defendants never mentioned anything about a deed of trust. The Dicks did not see all of the papers which they signed. Mr. Dick saw the purchase order on the top of the stack. As to the papers underneath, all he could see was the line on which he was to place his signature. The Dicks would have made no purchase had they lmown a deed of trust was involved or to be signed or had they known of the total price.
 

 The Longoria transaction
 
 (counts VII and VIII) :
 

 Defendants contacted Mr. and Mrs. Longoria in January 1963. Parker appeared first and stated that he wanted to use the Longoria house as a model home for the display of aluminum siding in an advertising campaign. Parker stated-that the ALCOA representative was seated-in the car just outside the house. Parker brought Ex into the house and stated that the Longorias would pay only a special
 
 *666
 
 price for their siding because their house would be used for advertising purposes. Ex told the Longorias that the complete price would be $3,450 and they would not have to worry about the interest since the company carried its own financing. No mention was made of an interest charge of $2,028.48. The papers to be signed were presented in a stack, or sheaf, by Parker. Parker noted where each paper was to be signed. Among the papers was a deed of trust which was never mentioned hy defendants, or either of them. The Longorias would not have signed the papers had they realized the true price or that one of the papers was a deed of trust.
 

 The Kincaid transaction
 
 (counts XI and XII):
 

 Defendants contacted the Kincaids in March 1963. Ex represented himself as “Mr. Seymour” from Kaiser Aluminum Company. Ex said that Kaiser had a large sum of money available for promotional purposes and that by using the Kincaid home as a model home he could make them a very good deal. The quoted price was $2,900. The actual later determined price of $5,398.68 was never mentioned by defendants. The material placed on the house within an hour after the papers were signed was Alside Aluminum and not Kaiser Aluminum. The papers signed by the Kincaids were in a stack. Defendants marked by cheek marks where the Kincaids were to sign. Parker flipped up the bottom of each paper so that the Kincaids would sign the paper below. Mr. Kincaid noticed that one of the papers had to do with a lien contract and he attempted to read it; however, defendants actively talked with him, asking him various questions, and thereby distracted his attention from the contents of the paper. The Kincaids would not have signed the papers had they known that among them was a deed of trust or that the total price was $5,398.68.
 

 Defendants testified that they told each customer the total price involved, that they went through each contract with each customer, that they explained the nature of a deed of trust to each customer, and showed each customer the deed of trust involved, that they never stated to anyone that his home would be used as a model home or that they depicted themselves as representatives of Kaiser Aluminum or Alcoa Aluminum.
 

 Appellants now contend that CAL JIG instruction No. 39
 
 [1]
 
 (requested by appellants) was not specific enough and that no
 
 *667
 
 instruction was given on lesser and included offenses; further, that the evidence is insufficient to support the judgments and by reason of pretrial publicity they were denied due process of law.
 

 Appellants assert that in many instances at the trial representations allegedly made to a prosecuting witness by one defendant, in the absence of the other defendant, were admitted into evidence. Counsel states that only on two occasions were objections made to such hearsay declarations as to the party not sought to be charged with the contents of the conversations. It is asserted that the instruction (CALJIC No. 39) should have been made more specific. Under the circumstances, had appellants wanted a more specific instruction, they should have presented it at the proper time which they did not do. (See
 
 People
 
 v.
 
 Reed,
 
 38 Cal.2d 423, 430 [240 P.2d 590];
 
 People
 
 v.
 
 Williams,
 
 189 Cal.App.2d 29, 40 [11 Cal.Rptr. 43].)
 

 As to the statement that the representations so made were hearsay, appellants seemingly fail to understand that “ [t]he gist of hearsay is that it is an out-of-court utterance offered to prove the truth of what is asserted in the utterance.”
 
 (People
 
 v.
 
 Marsh,
 
 58 Cal.2d 732, 737 [26 Cal.Rptr. 300, 376 P.2d 300].) The statements of appellants to their victims in this ease were not offered to prove the truth of their statements, they were offered for the exact opposite, namely, to show that appellants were not telling the truth. In any event, the record in this ease is crystal clear to the effect that appellants in each charge (with the exception of counts XIII and XIV, where Ex was individually charged) aided and abetted each other to the fullest, and, consequently, that all of the statements made were admissible against each appellant to show the crime which each one of appellants aided and abetted.
 
 (People
 
 v.
 
 Dalton,
 
 172 Cal.App.2d 15, 19-20 [341 P.2d 793].) Furthermore, as heretofore indicated, no objection was made to such testimony. In the absence of a seasonable objection, an appellant will not be heard to complain of such testimony. (See
 
 People
 
 v.
 
 Dement,
 
 48 Cal.2d 600, 604 [311 P.2d 505] ;
 
 People
 
 v.
 
 Lint,
 
 182 Cal.App.2d 402, 414 [6 Cal.Rptr. 95].)
 

 With reference to the contention that the court should have instructed upon a lesser and included offense, it is clear from the record that at a conference between the parties and
 
 *668
 
 the court with reference to the instructions, counsel for appellants, on a stipulation, withdrew such an instruction. In any event, the evidence here shows that appellants falsely represented to their victims that contractual obligations to pay for siding would be unsecured. The contractual promises to pay (which are “property” within the meaning of Pen. Code, § 487) all exceeded the sum of $200. It is stated in
 
 Buck
 
 v.
 
 Superior Court,
 
 232 Cal.App.2d 153, 160 [42 Cal.Rptr. 527, 11 A.L.R.3d 1064] : “A contractual obligation to pay money is properly subject to the theft statutes [citation] and a written contractual obligation to pay in excess of $200 is property of value in excess of $200, as contemplated by the definition of grand theft [citation].”
 

 The evidence of the prosecution was believed by the jury and apparently by the judge who tried the case. The evidence of appellants was disbelieved. It is plain that if appellants were guilty of any offense it was of the offenses charged. (See
 
 People
 
 v.
 
 Allison,
 
 245 Cal.App.2d 568, 574 [54 Cal.Rptr. 148];
 
 People
 
 v.
 
 Thomas,
 
 58 Cal.2d 121, 127 [23 Cal.Rptr. 161, 373 P.2d 97].)
 

 The crime of forgery is committed when a defendant, by fraud or trickery, causes another to execute a deed of trust or other document where the signer is unaware, by reason of such trickery, that he is executing a document of that nature. In
 
 Buck
 
 v.
 
 Superior Court, supra,
 
 (an aluminum siding ease) 232 Cal.App.2d 153, it is stated at page 162: “Where a person who has no intention of selling or encumbering his property is induced by some trick or device to sign a paper having such effect, believing that paper to be a substantially different instrument, the paper so signed is just as much a forgery as it would have been had the signature been forged. [Citations.]
 

 . . . The crime of forgery is complete when one makes or passes an incorrectly named instrument with intent to defraud, prejudice, or damage, and proof of loss or detriment is immaterial. [Citations.] Whether the instrument forged has independent value is unimportant; the crime is complete when the act is done with the requisite intent.” (See also
 
 Buck
 
 v.
 
 Superior Court, supra,
 
 245 Cal.App.2d 431, 436-437 [54 Cal.Rptr. 282] ;
 
 People
 
 v.
 
 Carson,
 
 240 Cal.App.2d 477, 480 [49 Cal.Rptr. 653].)
 

 Clearly, from the evidence in this case appellants are guilty of the forgeries as charged and of the grand theft as charged. (See
 
 Buck
 
 v.
 
 Superior Court, supra; People
 
 v.
 
 Bresin,
 
 245 Cal.App.2d 232, 237-238 [53 Cal.Rptr. 687];
 
 Buck
 
 v.
 
 Superior Court, supra,
 
 232 Cal.App.2d 153, 162.)
 

 
 *669
 
 As to the contention of prejudicial pretrial publicity, the record shows that appellants did not ask for the
 
 voir dire
 
 examination of jurors for the record on appeal. As a consequence, they are unable to carry their burden of pointing out any such prejudicial error in the record. (See
 
 People
 
 v.
 
 Corral,
 
 224 Cal.App.2d 300, 307 [36 Cal.Rptr. 591];
 
 People
 
 v.
 
 Terry,
 
 180 Cal.App.2d 48, 54 [4 Cal.Rptr. 597];
 
 County of Nevada
 
 v.
 
 Phillips,
 
 111 Cal.App.2d 428, 430 [244 P.2d 495].) In any event, what wets stated in
 
 People
 
 v.
 
 Parker,
 
 235 Cal.App.2d 100, 105 [44 Cal.Rptr. 909], is appropriate: “. . . On the other hand, the charges against Parker were not particularly ‘juicy.’ His were ‘economic’ offenses, not crimes of lurid violence or rampant sexuality. Crimes of the latter kind attract vastly more attention and tend to excite more public hostility than the former. With rare exceptions, offenses of the economic variety arouse nothing more than the casual reaction described by the jury panel members in this ease. Possibly the news value of such offenses is confined to relatively small segments of the reading, viewing and listening public. Outside these limited spheres of interest, the public attitude toward the accused is more apt to be one of indifference rather than prejudice. To all appearances, Parker’s was no
 
 cause celebre.
 
 None of the jury panel members demonstrated more than a routine and casual interest in the publicity and all disavowed any preconceived attitude toward the defendant.
 

 “California law evinces a policy permitting acceptance of jurors who, after contact with pretrial news reports, commit themselves to impartiality and fairness. [Citations.] Uncritical acceptance of professions of objectivity would be naive. Such professions must be weighed against the nature of the crime and the color and impact of the publicity. In relation to the charges against Parker and in the absence of a record of provocative publicity, we are not at all skeptical of the jurors’ disavowals. It was easy to be quite cool about the entire matter. ’ ’
 

 The judgments are, and each is, affirmed. The purported appeal from the order denying motion for new trial is dismissed.
 

 Wood, P. J., and Lillie, J., concurred.
 

 A petition for a rehearing was denied November 27, 1967, and appellants’ petition for a hearing by the Supreme Court was denied December 27, 1967.
 

 [1]
 

 “
 
 Where evidence has been received against one of the defendants but is not received as against the other, the jury may consider such evi
 
 *667
 
 denee only as against the defendant against whom it was permitted to be received. It may not be considered by the jury for any other purpose, or against any other defendant. ’
 
 ’