[No. B173593. Second Dist., Div. Four. Dec. 22, 2004.]

THE PEOPLE, Plaintiff and Appellant, v.
BURL LOONEY et al., Defendants and Respondents.

## COUNSEL

Steve Cooley, District Attorney, Patrick D. Moran and Roderick W. Leonard, Deputy District Attorneys, for Plaintiff and Appellant.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Respondent Burl Looney.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Respondent Judy Looney.

## OPINION

**HASTINGS, J.—**

### INTRODUCTION

After conducting a preliminary hearing, the magistrate held defendants Burl and Judy Looney to answer on, inter alia, four counts of forgery based upon their actions in inducing Joseph Wickers, who was mentally infirm, to execute several testamentary-related documents. (Pen. Code, § 470,

subd. (c).)[1] In the superior court, defendants moved to set aside that portion of the information charging them with forgery on the basis that their actions did not fall within the ambit of the charging statute. (§ 995.)[2] The court granted the motion. This appeal by the People follows. (§ 1238, subd. (a).)

The People do not claim that defendants committed forgery in the traditional sense by falsifying a signature or altering a document. Instead, the People contend: "The issue before this Court is the interpretation of the crime of forgery[.] Case authority provides that procuring of a genuine signature to an instrument by fraudulent representations constitutes forgery. [Citations.] Defendants created a false reality in Mr. Wickers such that when they induced him to sign the documents giving control and ultimate ownership of his assets to and for the benefit of the defendants, and where it was clear he lacked the understanding of what he had done, the defendants committed the crime of forgery."

■ As we shall explain, the People's argument is not persuasive. It is based upon a misreading of decisional law. The cases the People cite are factually distinguishable because each involved a defendant who misrepresented to the victim the true nature of the document being signed. Here, however, the element of trick or fraud is missing because defendants did accurately explain to the victim (Wickers) the nature of the documents they induced him to sign. We therefore will affirm the trial court's dismissal of the forgery charges to permit defendants to be tried on the two charges still pending from these events.

## FACTUAL AND PROCEDURAL BACKGROUND

■ "Upon review of a motion to set aside an information, this court disregards the superior court's ruling and directly examines that of the magistrate. [Citation.] We, like the superior court, must draw every legitimate inference in favor of the magistrate's ruling [holding defendants to answer] and cannot substitute our judgment on the credibility of witnesses or weight of the evidence. [Citations.]" (*People v. Eid* (1994) 31 Cal.App.4th 114, 125 [36 Cal.Rptr.2d 835].) Viewed in that light, the evidence at the preliminary hearing established the following.

On September 8, 2000, when Wickers signed the documents presented to him by defendants, he was 91 years old and had survived two wives. Two

---

[1] The statute provides: "Every person who, with the intent to defraud, alters, corrupts, or falsifies any record of any will, codicil, conveyance, or other instrument, the record of which is by law evidence, or any record of any judgment of a court or the return of any officer to any process of any court, is guilty of forgery."

[2] All statutory references are to the Penal Code.

years earlier, he had been diagnosed with senile dementia. Because his abilities to care for himself had deteriorated, Carol Moore, a neighbor and friend, helped him in June 1999 to move into a nursing home, Carroll Manor Board and Care Home.

The defendants, Burl and Judy Looney, are married.[3] Judy Looney is the niece of Joseph Wickers's deceased first wife. Burl Looney is an attorney. Defendants had been estranged from Wickers since 1993. However, commencing in March 2000, they began to visit him in the nursing home after learning his house and its furnishings were for sale. At this point, Wickers's will left his property to Moore and her husband. Wickers had also executed a power of attorney in favor of Moore.

On September 8, 2000, defendants went to Carroll Manor with four documents: notice of revocation of power of attorney, durable power of attorney for management of property and personal affairs, declaration of trust, and affidavit to self-prove last will and testament. The effect of these documents was to revoke the power of attorney previously granted to Moore, to give defendant Judy Looney power of attorney, to make defendant Judy Looney beneficiary of Wickers's estate, and to make defendant Burl Looney trustee of Wickers's property.

Defendants were accompanied by a notary and several friends who served as witnesses to the execution of the documents. Defendant Burl Looney explained the documents to Wickers. In particular, he explained how the two power of attorney documents would now allow defendant Judy Looney to manage his affairs and how the trust and will would disburse his property. Wickers was passively agreeable, nodding his head and stating "Okay." During this process, defendant Judy Looney told Wickers that "once he signed these papers that she would do her best to get him out of that [nursing] home[.]" At one point, Wickers stated he wanted 10 percent of his income to go to the Mormon Church, a wish he had expressed earlier to defendant Judy Looney. However, the durable power of attorney he signed that day did not impose any mandatory duty upon his attorney in fact (defendant Judy Looney) to make such a gift; it merely gave her the option to make such a contribution in whatever percentage she chose.

Jan Tatangelo notarized the documents. After the process was completed, Catalina Cibrian, a caregiver at the nursing home, came into the room and asked what was going on. Cibrian told Tatangelo that defendants had "just started coming around recently." Tatangelo spoke to Wickers and realized he was confused. She told defendant Burl Looney that she had to void the notary

---

[3] They married in 1969 and separated in 1991.

because Wickers had not understood what he was signing. Defendant Burl Looney replied that Wickers was fully competent and knew what he was doing. He refused to return the documents to Tatangelo.

Thereafter, defendants went to various banks to determine where Wickers had accounts. However, they did nothing to move him out of Carroll Manor to either their home or another nursing home.

Meanwhile, Moore, who learned what defendants had done, contacted law enforcement to investigate.

Wickers died on December 6, 2002. The will that the defendants had him sign was not admitted into probate. Instead, his estate was distributed according to his prior will that left all of his property to Moore and her husband.

Dr. Susan Bernatz examined Wickers for purposes of this prosecution and testified that in her expert opinion he had moderate to severe dementia.[4] Wickers also suffered from Parkinson's disease which contributed to his dementia. Her tests showed he suffered from short- and long-term memory deficits. In her opinion, when defendants presented Wickers with the documents to sign, he "was not capable of understanding the nature and consequences of making significant financial decisions" and "was unable to make an intelligent choice of his own . . . regarding any type of financial transactions." She opined that Wickers would not have understood what the documents were.

In a similar vein, Cibrian (the caregiver) testified that when she entered Wickers's room shortly after the signing on September 8, 2000, Wickers was crying. He told her: "They made me sign." She asked him what kind of papers had he signed and he responded he did not know. Cibrian also testified that around that time Wickers had memory problems.

Based upon the above facts, the magistrate held defendants to answer on four counts of forgery (§ 470, subd. (c)), one count of attempted theft from an elderly person (§ 664/368, subd. (d)), and one count of attempted grand theft (§ 664/487, subd. (a)). An information was filed charging these six crimes. The superior court granted the motion to dismiss as to the four forgery counts; the other two charges remain.[5]

---

[4] Dr. Bernatz examined Wickers in June 2002.

[5] The information also charged defendant Burl Looney with two counts of tape-recording phone conversations in February 2001 (§ 632, subd. (a)). Although the trial court dismissed those charges, the People have abandoned any appeal in regard to that ruling.

## DISCUSSION

The People contend defendants committed the crimes of forgery because defendants "created in the mentally incompetent Mr. Wickers a false reality, [they] made false representations, and it was clear when he signed the documents he did not understand what he was doing. . . . [¶] . . . Mr. Wickers[] got nothing for his signature, defendants did not even comply with his request to tithe to his church nor follow through with their representation to remove him from the nursing home. Instead, defendants gained control, and ultimate ownership, of all his assets. Mr. Wickers did not understand what he was signing. Mr. Wickers was also induced to sign based on false reality and misrepresentation."

The People rely upon two cases to support their argument that the crime of forgery is implicated by this fact pattern.

The first case is *People v. Nesseth* (1954) 127 Cal.App.2d 712 [274 P.2d 479]. There, the defendant, a used car dealer, falsely told the victims the contracts that they were to sign were for $1,196. At the time of signing, the spaces for the balance owed were blank. After the victims signed, the defendant filled in the unpaid balance as $1,800. (*Id.* at p. 715.) On appeal, the issue was whether it was appropriate to charge the defendant with forgery. The court held: "That the correct rule is that the procuring of a genuine signature to an instrument by fraudulent representations constitutes forgery is supported by . . . well reasoned authorities. [Citations.] . . . [¶] Likewise, the rule is established in California that alteration of a document without authority with the intent to defraud may constitute forgery and that such alteration may consist of the insertion of matter in the document in question after it has been signed. [Citations.]" (*Id.* at pp. 719–720.)

The second case is *Buck v. Superior Court* (1965) 232 Cal.App.2d 153 [42 Cal.Rptr. 527] in which the victims were tricked into signing a blank deed of trust by an aluminum siding salesman. When the defendant presented a purchase contract for signature, he included among the papers a blank deed of trust which the victims inadvertently signed. The defendant later filled in the blanks. The issue on appeal was whether the defendant had committed a forgery when he tricked the victims into signing the blank deed of trust. Relying upon *Nesseth*, the appellate court concluded he had. It reasoned: "Where a person who has no intention of selling or encumbering his property is induced by some trick or device to sign a paper having such effect, *believing that paper to be a substantially different instrument*, the paper so signed is just as much a forgery as it would have been had the signature been forged. [Citations.]" (*Id.* at p. 162, italics added.) *Buck* was followed in a series of cases, each of which involved an aluminum siding salesman who

tricked homeowners into signing a trust deed. The appellate courts held the defendants had committed a forgery because they had procured a genuine signature to a document by trick or fraud. (*People v. Parker* (1967) 255 Cal.App.2d 664, 672 [63 Cal.Rptr. 413]; *People v. Johnson* (1966) 247 Cal.App.2d 331, 337 [55 Cal.Rptr. 450]; *People v. Bresin* (1966) 245 Cal.App.2d 232, 235–236 [53 Cal.Rptr. 687]; and *People v. Carson* (1966) 240 Cal.App.2d 477, 480 [49 Cal.Rptr. 653]; see also 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 164, pp. 194–195 and Annot., Forgery—Procuring Signature by Fraud (1967) 11 A.L.R.3d 1074.)

Given the facts of this case, the above authorities do not support the People's contention that defendants committed four counts of forgery in this case. At best, the evidence here establishes the procuring of the signature of an individual whose mental competency was questionable but to whom no misrepresentations were made about the true nature of the documents signed. In each of the cases relied upon by the People, the defendant later altered the documents the victims had signed. In each instance, the appellate court held a forgery had been committed because the document was significantly different from the document originally signed by the victim. Here, on the other hand, defendant Burl Looney attempted to explain the true legal significance of the documents to Wickers. And, in contrast to the cases discussed above, there was no evidence that Wickers signed blank documents that defendants later completed or that defendants ever altered the documents.

The People's reliance on evidence that suggests defendants falsely represented that they would help move Wickers from Carroll Manner and would ensure that 10 percent of his income would be given to the Mormon Church is unavailing. These misrepresentations appear to be collateral to the execution of the documents[6] and, more importantly, involve no misrepresentation about the nature of the documents Wickers did sign.

Taken to its core, the People's position is that inducing a mentally incompetent person to sign a document that has been accurately represented is committing a forgery. We do not believe that current law supports the People's theory. Nor do we believe the facts of this case lend themselves to an extension of the law. The two charges still pending against defendants— attempted grand theft and attempted theft from an elderly person—accurately reflect the evidence presented at the preliminary hearing.

---

[6] On this point, defendant Burl Looney notes: "[The People] go[] to great length to claim that Mr. Wickers did not understand what he was signing, presumably due to a lack of mental competency on his part. What [the People] fail[] to address is if Mr. Wickers could not understand anything, how could he then have relied upon or been induced by any alleged misrepresentations on the [defendants'] part to sign the documents?"

## DISPOSITION

The judgment (dismissal of counts 1–4 of the information) is affirmed.

Epstein, P. J., and Curry, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 30, 2005.