[No. E042427. Fourth Dist., Div. Two. Apr. 1, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL STEPHEN MARTINEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part III.

## COUNSEL

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, James D. Dutton and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**RICHLI, J.**—When victim Ruth Michiel ran into financial difficulties, she was afraid that two houses she owned would go into foreclosure. Defendant Paul Stephen Martinez offered to help her; at his direction, she signed a stack of documents. Later, she learned that a trust deed had been recorded against one of the houses, purportedly to secure a $25,000 debt to defendant. Michiel did not deny signing the trust deed but denied doing so knowingly; moreover, the notary whose name appeared on it denied ever notarizing it.

Defendant was found guilty of forgery of the notary's signature (count 1) and forgery of Michiel's signature (count 3) (Pen. Code, § 470, subd. (d)), forgery of a public seal (count 2) (Pen. Code, § 472), and recording a forged instrument (count 4) (Pen. Code, § 115, subd. (a)). He was placed on probation for three years.

Defendant contends that there was insufficient evidence to support his conviction for forging Michiel's signature, because there was no evidence that her signature was not genuine and no evidence that he used any affirmative misrepresentations concerning the nature of the trust deed to procure her genuine signature. We disagree; there was evidence that defendant did make affirmative misrepresentations concerning the nature of the trust deed. In any event, he could be convicted of forgery even in the absence of any such affirmative misrepresentations.

We will further hold, however, that defendant's conviction for forging Michiel's signature must be vacated for a different reason. Under Penal Code section 470, subdivision (d), his falsification of two signatures on a single trust deed constituted only one count of forgery, not two.

In the unpublished portion of this opinion, we will discuss defendant's challenges to some of the conditions of probation.

I

### FACTUAL BACKGROUND

Victim Ruth Michiel owned two houses in Victorville, one on Greenwood Place and one on La Villa Drive. Around 2001, she began having financial difficulties. She was concerned that the houses would go into foreclosure. Someone suggested that defendant could help her refinance them.

When she contacted defendant, he told her that he was going to help her, adding, "Don't worry. You won't lose the property." Michiel testified that defendant had her sign "quite a few" documents, supposedly to help her with her financial problems. Defendant's ex-girlfriend confirmed that she was present when defendant had Michiel sign "a stack of documents," supposedly so Michiel could file for bankruptcy.

In July 2001, a trust deed on the Greenwood house in favor of defendant was recorded. On the same date, a grant deed conveying the Greenwood house to defendant was also recorded.[2] Defendant rented out the Greenwood house; he did not pass along any of the rent to Michiel.

Michiel arranged to sell the La Villa house to her stepdaughter, but they were not able to close the sale because—as they then discovered—a trust deed had also been recorded against the La Villa house. It was dated August 9, 2002, and recorded on November 20, 2002. It purported to secure a promissory note for $25,000. The beneficiaries were defendant and "Chase P.M."

Concerning this trust deed, Michiel testified:

"Q . . . Is that your signature?

"A It sure looks like it. [¶] . . . [¶]

"Q . . . [D]id you sign the document?

"A I don't remember."

She further testified that she did not knowingly sign a trust deed in defendant's favor; she did not owe him any money and thus had no reason to sign one.

The La Villa trust deed was purportedly notarized by one Janet McGregor. Janet McGregor testified that she was a notary, but she had not notarized the trust deed. Her supposed signature on the trust deed was not in her handwriting. In February 2002, however, she had notarized a different document for defendant.

---

[2] None of the forgery or other charges were based on these documents relating to the Greenwood house, and Michiel was not asked about them.

The owner of a print shop testified that, sometime after June 2002, defendant asked him to make a notary stamp in the name of Janet McGregor. As a sample of the stamp he wanted, defendant showed him two documents purportedly notarized by Janet McGregor. The owner never made the stamp because defendant never came back with the necessary authorization.

Defendant was not a notary. Nevertheless, defendant's ex-girlfriend testified that she had seen him notarize trust deeds and other documents. In one instance, he had used a notary stamp in the name of Maria Chavez. She turned over to the police a number of notary and other official stamps that defendant had had in his possession, including stamps for notaries in Gwinnett County, Georgia, and Los Angeles County, California.

When the police interviewed defendant, he told them that the trust deed on the La Villa house "just arrived in the mail, . . . out of the blue," from the county recorder's office. He denied having anything to do with preparing it. He admitted that Michiel did not owe him any money. He identified Chase P.M. as a defunct company that he owned. He volunteered to execute a reconveyance but never actually did.

With respect to the Greenwood house, defendant told police that Michiel had given it to him "because it was going to be foreclosed on anyway."

Defendant took the stand at trial (against his defense counsel's advice). His testimony was rambling and disjointed. We summarize it as best we can, recognizing that the jury may have understood it differently (or not at all).

Defendant testified that Michiel consulted him about keeping the Greenwood house out of foreclosure, but he told her that it was overencumbered, and there was nothing he could do. He referred her to his "friend" (or "business partner"), Al Contrera.

Later, Contrera told defendant that Michiel had executed a trust deed on the Greenwood house in favor of defendant. Contrera then instructed defendant, as holder of the second trust deed, to call the holder of the first trust deed and try to buy it out at a discount. Defendant did call and did obtain the agreement of the holder of the first trust deed.

Meanwhile, however, a buyer expressed interest in buying the Greenwood house. Contrera and Michiel therefore came up with a different scheme: They would obtain a fraudulent appraisal, sell the house for an inflated amount, and

split the profits. Defendant refused to participate. This made Michiel angry. Nevertheless, Michiel ultimately just gave defendant the Greenwood house.

Defendant denied having anything to do with the trust deed on the La Villa house. He first became aware of it when the police questioned him about it. However, he believed that Contrera and/or Michiel had created it, as they had created one on the Greenwood house, in the hope that defendant could arrange to buy out the first trust deed at a discount. He denied forging any of the signatures on it; he denied using McGregor's seal.

Defendant admitted offering to execute a reconveyance. He explained that he did not do so because he was angry that Michiel had "call[ed] the cops," so he told her that he would execute the reconveyance only if she paid in advance for the notary and for recordation, which she never did.

Michiel denied knowing Al Contrera.

## II

### THE CONVICTION FOR FORGERY OF MICHIEL'S SIGNATURE

A. *The Sufficiency of the Evidence.*

Defendant contends that there was insufficient evidence to support his conviction for forgery of Michiel's signature because there was no evidence that he affirmatively misrepresented the nature of the trust deed to Michiel.

There was no evidence that Michiel's signature on the La Villa trust deed was not genuine. Michiel admitted that it looked like hers. She also admitted that defendant had had her sign a number of documents. Nevertheless, a forgery conviction can be based on a document with a genuine signature. "[F]orgery is committed when a defendant, by fraud or trickery, causes another to execute a . . . document where the signer is unaware, by reason of such trickery, that he is executing a document of that nature." (*People v. Parker* (1967) 255 Cal.App.2d 664, 672 [63 Cal.Rptr. 413].)

Defendant argues that this rule applies only where the "fraud or trickery" consists of an affirmative misrepresentation regarding the nature of the document. He concedes that Michiel may have "signed the . . . trust deed without understanding what she was signing," but he argues that he "did not make any material affirmative misrepresentations to her."

Preliminarily, even assuming defendant is correct about the law, there was sufficient evidence that he did, in fact, affirmatively misrepresent the nature of the trust deed. Michiel testified that defendant "provided [her] with a number of documents to sign *to try and help* [*her*] *with* [*her*] *financial problems . . . .*" (Italics added.)

Similarly, defendant's ex-girlfriend testified:

"Q What occurred at this meeting between Mr. Martinez and Ms. Michiel?

"A Apparently, Ms. Michiel was having some kind of financial trouble. Paul was talking to her about how he could help her.

"Q How did he say he could help her?

"A He suggested she file bankruptcy, and he said he would help her file bankruptcy. [¶] . . . [¶]

"Q Were there a stack of documents that he had her sign?

"A Yeah. Also, he was assisting her with the bankruptcy, so there was bankruptcy forms and things like that. [¶] . . . [¶]

"Q When he had her sign documents, how did he—was it just a stack of documents? Okay. I need you to sign here, here, here?

"A Yeah.

"Q Or was he going over these documents and explaining what—

"A No, he would usually—there would be a stack."

In sum, there was evidence that defendant presented Michiel with a stack of documents to be signed and that he affirmatively misrepresented to her that their purpose was to help her with her financial problems and/or help her file a bankruptcy.

Separately and alternatively, however, even assuming there was no evidence that defendant affirmatively misrepresented the nature of the trust deed, he could still be found guilty of forgery. *People v. Parker, supra,* 255 Cal.App.2d 664, involved strikingly similar facts. There, the defendants (Parker and Ex) sold aluminum siding to a number of homeowners. They gave each purchaser a stack of papers, including a trust deed, and they indicated where the purchaser should sign. Occasionally, they affirmatively

misrepresented the nature of the trust deed; for example, they told two couples that the papers consisted of a "purchase order," plus several "copies" thereof. (*Id.* at p. 668 [Edwards and Helland transactions].) Most of the time, however, they simply failed to disclose that the papers included a trust deed. (*Id.* at pp. 667 [Kinsfather transaction], 668–669 [Buss transaction], 669 [Dick transaction], 669–670 [Longoria transaction], 670 [Kincaid transaction].) The appellate court held that there was sufficient evidence of forgery in connection with each and every sale (see *id.* at pp. 665–666): "The crime of forgery is committed when a defendant, by fraud or trickery, causes another to execute a deed of trust or other document where the signer is unaware, by reason of such trickery, that he is executing a document of that nature." (*Id.* at p. 672.) "Clearly, from the evidence in this case appellants are guilty of the forgeries as charged . . . . [Citations.]" (*Ibid.*)

Defendant relies on *People v. Looney* (2004) 125 Cal.App.4th 242 [22 Cal.Rptr.3d 502]. There, the defendants induced Wickers, a 91-year-old man who was in a nursing home and suffering from senile dementia, to sign four documents, including a will, in their favor. (*Id.* at pp. 244–246.) One of the defendants explained to Wickers what the effect of the documents would be. (*Id.* at p. 245.) The defendants were charged with four counts of forgery, but the trial court dismissed these charges. (*Id.* at p. 246.) In an appeal by the People, the appellate court affirmed. It stated: "At best, the evidence here establishes the procuring of the signature of an individual whose mental competency was questionable but to whom no misrepresentations were made about the true nature of the documents signed. . . . [D]efendant Burl Looney attempted to explain the true legal significance of the documents to Wickers." (*Id.* at p. 248.) It concluded: "Taken to its core, the People's position is that inducing a mentally incompetent person to sign a document that has been accurately represented is committing a forgery. We do not believe that current law supports the People's theory." (*Ibid.*)

In sum, then, in *Looney*, the defendants affirmatively disclosed the true nature of the documents that they were asking the alleged victim to sign. By contrast, in *Parker*, the defendants failed to disclose the true nature of the document. Here, of course, there was ample evidence that defendant failed to disclose the true nature of the trust deed. Thus, there was sufficient evidence to support a forgery conviction.

B. *Conviction on Multiple Counts.*

On our own motion, we questioned whether defendant could properly be convicted on two counts of forgery.

Both counts charged defendant with forgery under Penal Code section 470, subdivision (d). That subdivision, as relevant here, applies to "[e]very

person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine, any of the [specified] items, knowing the same to be false, altered, forged, or counterfeited . . . ." Thus, it is violated each time a person makes and/or passes a forged *item*, no matter how many forged *signatures* are on the item.[3]

Our research has revealed only one California case on point—*People v. Dole* (1898) 122 Cal. 486 [55 P. 581]. There, the information alleged that the defendant altered a check, forged multiple endorsements on it, and then passed it to the State Loan and Trust Company. On appeal, the defendant argued that the information was defective because it charged more than one offense.[4] The court responded: "The intent to defraud is the essential element of the crime of forgery, and the whole series of acts charged against defendant is alleged to have been done with the single intent to defraud the State Loan and Trust Company. But one offense, therefore, was charged . . . ." (*Dole*, at p. 489.)

■ Admittedly, nowadays, in ascertaining the propriety of multiple conviction, the focus of the inquiry has shifted toward the Legislature's intent in enacting the statute (see, e.g., *In re Carleisha P.* (2006) 144 Cal.App.4th 912, 918–923 [50 Cal.Rptr.3d 777]; *People v. Shabtay* (2006) 138 Cal.App.4th 1184, 1190–1191 [42 Cal.Rptr.3d 227]) and away from the defendant's intent in committing the crime (although the defendant's intent is still relevant to the propriety of multiple punishment under Pen. Code, § 654; see *Neal v. State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]). Nevertheless, we still reach the same result as in *Dole*, even when we travel by this different route.

Other cases, although admittedly not dealing with this precise issue, seem to have assumed that there can be only one count of forgery per document. For example, very early on, in *People v. Frank* (1865) 28 Cal. 507, the Supreme Court stated: "[T]ake the statute against forgery, under which the

---

[3] Our holding is limited to multiple convictions under Penal Code section 470, subdivision (d).

Penal Code section 470, subdivision (a) applies to "[e]very person who, with the intent to defraud, knowing that he or she has no authority to do so, signs the name of another person or of a fictitious person to any of the [specified] items . . . ." Similarly, Penal Code section 470, subdivision (b) applies to "[e]very person who, with the intent to defraud, counterfeits or forges the seal or handwriting of another . . . ." Thus, it is at least arguable that these subdivisions are violated each time a person makes and/or passes a forged signature, even if only a single document is involved.

[4] Until 1905, Penal Code former section 954 provided that an indictment or information could charge only one offense. (Compare Stats. 1905, ch. 574, § 1, p. 772 with Code Amends. 1873–1874, ch. 614, § 44, p. 437.)

indictment in this case was found, where we find several acts enumerated, all of which are declared to be forgery. Thus, 'the falsely making,' 'altering,' 'forging,' 'counterfeiting,' 'uttering,' 'publishing,' 'passing,' 'attempting to pass' any of the instruments or things therein mentioned, with the intent specified, is declared to be forgery. Now each of those acts singly, or all together, if committed *with reference to the same instrument*, constitute but one offense. Whoever is guilty of either one of these acts is guilty of forgery; but if he is guilty of all of them, *in reference to the same instrument*, he is not therefore guilty of as many forgeries as there are acts, but of one forgery only." (*Id.* at p. 513, italics added.)

Similarly, in *People v. Cline* (1947) 79 Cal.App.2d 11 [179 P.2d 89], the trial court instructed the jury, over the defendant's objection: " 'The making or forging of a number of forged instruments constitutes as many crimes as there are forged instruments, each forged instrument being the product of a separate crime' . . . ." (*Id.* at p. 19; see also *id.* at p. 20.) The appellate court held: "[T]he ruling of the trial court must be sustained. . . . [T]he forging and uttering *of one instrument* constitute but one offense [citation] . . . ." (*Id.* at p. 21, italics added.)

And in *People v. Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364], the court rejected the contention that signing another's name on three separate credit card slips constituted only a single crime. (*Id.* at pp. 851–855.) The court stated: "It has been held that the forgery of several documents at the same time and in the course of one transaction constitutes *a separate offense for each instrument*. [Citations.]" (*Id.* at p. 852, italics added.)

We therefore conclude that defendant was improperly convicted on two counts of forgery instead of just one. Hence, we will reverse and strike his conviction on count 3.

III

PROBATION CONDITIONS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 754.

## IV

## DISPOSITION

The conviction on count 3 (forgery of Michiel's signature) is reversed and stricken. Probation conditions Nos. 15, 17, and 18 are modified, as stated in part III, *ante*.

In all other respects, the judgment is affirmed.

McKinster, Acting P. J., and King, J., concurred.