Filed 1/27/14

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055362 |
| v. | (Super.Ct.No. SWF10001239) |
| AARON ALLEN FALLS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Larrie R. Brainard, Judge. (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Cynthia M. Jones, under the appointment of the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael T. Murphy and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part 3 under Issues and Discussion.

1

A jury convicted defendant, Aaron Falls, of second degree burglary (Pen. Code, § 459),[1] making, passing, uttering, publishing or possessing a fraudulent check with intent to defraud (§ 476) and possessing a completed check with the intent to utter and pass and facilitate the uttering and passing of it in order to defaud Vons (§ 475, subd. (c)). In bifurcated proceedings, defendant admitted having suffered four prior convictions for which he served prison terms. He was sentenced to four years in county jail and appeals, claiming he was incorrectly charged with an act not proved at the preliminary hearing, the trial court failed to hold a hearing on his motion to represent himself, the jury was misinstructed and he was improperly convicted of violating both sections 475 and 476. We reject his contentions and affirm.

## FACTS

The facts involving the offenses will be described in the connection with our discussion of the first issue raised by defendant. After defendant was tracked down by the police, he told a deputy sheriff that he did not do anything, but he knew who "snitched" on him. Later, he changed his story and said that his mother was going through a hard time financially, he wanted to help her out and he had reverted to his old ways of making money by using fraudulent checks. He admitted that he had used a fraudulent check at the Vons on May 28, 2010, and he did it to help his mother.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

**ISSUES AND DISCUSSION**

1. *Charging Defendant with an Act Not Proved at the Preliminary Hearing*

Defendant was charged by complaint with one count of burglary and one count of making, passing, uttering, publishing or possessing a fraudulent check with the intent to defraud any other person. At the preliminary hearing, a Riverside County Deputy Sheriff, who was the only witness to take the stand, testified that on May 28, 2010, a cashier at the Vons store in Lake Elsinore told him that defendant had entered the store and tried to pass a fake check in the amount of $185.26.[2] The cashier told the deputy that defendant had refused to remove his driver's license from his wallet when the cashier asked him for identification. At the conclusion of the preliminary hearing, the magistrate bound defendant over on the burglary but not on the other charged count. However, the People charged defendant by information with the burglary, the other charged count and with violating section 475, subdivision (c) in that he possessed a completed check with the intent to utter and pass in order to defraud Vons. Defendant filed no motion to dismiss this third count and he proceeded to trial on all three charges. He now contends that his right to due process was violated by the filing of this third charge, as he asserts that it was based on an act about which evidence was not presented at the preliminary hearing.[3] He is incorrect.

---

[2] There is no doubt that the check referenced by the deputy during the preliminary hearing is the same check introduced by the People at trial.

[3] We note that the People declined to address this issue.

3

At trial, the cashier testified that he rang up defendant's items, defendant wrote and handed him a check, which aroused the cashier's suspicion,[4] and the latter asked defendant where he got the check. Defendant said he had called the bank on which the check was drawn and was told that he could print checks on line, which the cashier knew was not true. The cashier asked defendant for his identification. Defendant said he had left it in his car and he was going to get it. The cashier handed defendant back this check and defendant put it in his pocket. No copy of this check was introduced into evidence at trial and there was no further evidence about it. Defendant left the store and returned five minutes later. Defendant then added cigarettes to the items that had already been rung up and the receipt, dated May 28, 2010 at 12:07 a.m., showed a total purchase of $185.26, including the cigarettes. Defendant then wrote a second check, in the amount of $185.26. The check bore the checking account holder's name as "Fredi Leon[.]" The cashier asked defendant for his identification for this second check, and defendant acted as though he was unable to pull the identification out of its holder in his wallet so the cashier could scan it. The cashier offered to help defendant pull his identification out, but defendant refused his help and he tried to talk the cashier into foregoing the scanning of his identification, but the cashier demurred. The cashier put this check through the check reader, which "usually doesn't" read a fake check and the reader did not read this check. The cashier was also suspicious of the identification defendant had offered—it looked to

---

[4] The cashier was not only an employee of Vons, but he also worked as a teller at the bank on which this check and the second one that defendant wrote were drawn, and in that latter capacity, had been trained to spot fraudulent checks.

the cashier like it was printed on paper and it lacked the clarity of legitimate pieces of identification. Additionally, the name on the identification was not Fredi Leon. Defendant tried to swipe a VISA gift card, but it did not work. The cashier told defendant that he could not accept the second check as payment for the items. Defendant left the store and the cashier followed him outside so he could write down the license plate number of the car into which defendant got, which the cashier did on the back of the second check defendant had given him. The following day, the cashier called the bank on which the second check had been drawn and discovered that the holder of the account that matched the account number appearing at the bottom of the check was not Fredi Leon.

The husband of the husband and wife joint owners of the account that matched the account number on the bottom of the second check testified that he did not know defendant, he had not given defendant permission to use any of his banking numbers and in late May, he had been informed that there may be a problem with this account, so he closed it and did not use it thereafter. He also testified that his name was not Fredi Leon, the address appearing on the second check was not his, and he had not given a Fredi Leon or anyone at that address permission to use his checks.

At trial, the deputy who had testified at the preliminary hearing testified that the cashier had *not* told him that there had been two checks used or attempted to be used in the transaction. Therefore, when the deputy testified at the preliminary hearing, he was only testifying about the second check and not the first, because the cashier had not mentioned the latter to him. It is equally clear that during their argument to the jury, both

5

the prosecutor and defense counsel addressed only the second check and not the first—the prosecutor claimed that the second check was fraudulent and defendant's intent to use it when he entered the Vons established the burglary, that his actual passing of this check proved the passing charge (count 2) and his possession of it, coupled with his intent to pass or use it in order to defraud Vons, established his guilt of count three, the possession charge. Whether defendant may stand convicted of both of these latter offenses based on his activity with the second check we will address later in this opinion. However, and contrary to the assertion of the People in regards to that other issue,[5] there was *always*

_____

[5] The People assert that one passage of the prosecutor's argument to the jury suggested that the possession count could be based on the first check. In discussing this count, the prosecutor said, inter alia, "[I]t's the same arguments [used for the passing count, which included the testimony of the actual owner of the account whose number was the same as the account number on the second check] that allow us to know that the defendant was aware it was a fake check and to know what his intent was. *The intent to defraud does not actually have to result in . . . actual fraud.* [The cashier] told you that he was keeping the groceries with him when the defendant went outside. He voided the transaction. He kept the groceries off to the side. [¶] So even though there was no actual monetary loss by Vons, that doesn't matter. Even though [the actual owner of the account whose number matched that at the bottom of the second check]'s account wasn't actually charged [the $185.26], that doesn't matter. It's just what the intent was. And the intent was to defraud." Although the cashier testified that the items that had already been rung up were kept "on the cart on the front of the register," after defendant pocketed the first check and went outside to get his identification, this did not mean that the prosecutor was arguing that defendant's possession of the first check constituted count three. The prosecutor went on to say that a customer is not able to leave the store with items until payment for those items issues, which was equally applicable to the fact that defendant left the store without the items after the cashier refused to accept the second check. More importantly, the context of the comment was that even though neither Vons nor the actual owner of the account whose number was the same as the number on the second check was not ultimately defrauded of $185.26, the amount of the second check, defendant still intended to defraud Vons and that, along with his possession of the check, was all that was required to establish the possession charge.

6

only one check that was the subject matter of this case.[6]  Defense counsel's failure to file a motion to dismiss count three on the basis that evidence as to it was not produced at the preliminary hearing would have been unsuccessful because evidence as to it was, indeed, produced at the preliminary hearing.

2.  *Failure to Hold a Hearing on Defendant's Faretta[7] Motion*

Defendant, on his own, brought his first *Marsden*[8] motion a little over a month after he was arraigned on the compliant.[9]  It was unsuccessful.  He brought his second one, this time against the second deputy public defender to represent him, nine months later, saying he "had asked his attorney to ask for a *Marsden* hearing."  The court below denied it.  Ten days later, he "interrupt[ed] the [c]ourt while the [c]ourt was calling another case . . .  [¶]  . . . about his representation."  Defendant's second deputy public defender said he had spoken to defendant about the matter that morning, and defendant wanted to request self-representation.  However, after a lengthy warning as to the pitfalls

---

[6]  Defendant's motion for a new trial corroborates this.  Because we so conclude, we need not address the issue, raised in defendant's supplemental opening brief, and not responded to by the People, that there was insufficient evidence to support his conviction of possessing a check with intent to defraud Vons based on his possession of the first check.

[7]  *Faretta v. California* (1975) 422 U.S. 806.

[8]  *People v. Marsden* (1970) 2 Cal. 3d 118.

[9]  Defendant had sent a letter to the court, which the court refused to read.  After discussing a matter connected to the case, and hearing a matter in another case, the court cleared the courtroom because defendant, himself, was asking that the Public Defender's Office be relieved as his attorney of record.  His deputy public defender at the time told the court that she was not declaring a conflict in this case.

of this by the court, defendant withdrew his request.  Defendant brought his third

*Marsden* motion less than a month later, while still represented by the second deputy

public defender, the same day both parties announced that they were ready for trial.

After a lengthy hearing during which defendant stated all his objections to the way his

attorney was handling the case and his attorney responded to those objections, the

calendaring judge denied the motion.[10]  Upon denial of the motion, defendant personally

announced that he would like to represent himself.  The calendaring judge informed

defendant that his motion would be heard that afternoon at 1:30 p.m., hours later, in the

trial courtroom miles away and in front of the trial court.  At the appointed time and

place, the trial court reminded the parties that defendant's *Marsden* motion of that

morning had been denied and it asked if anything needed to be done before it took up the

motions in limine.  Defendant was silent.  Defense counsel announced that defendant was

willing to waive jury trial on the prior allegations, the trial court informed defendant of

his right in this regard and defendant waived said trial.  A discussion concerning using

defendant's priors to impeach him then occurred, followed by discussions about the

admissibility of the video from Vons, the copy of the second check and the identification

that was found in the car in which defendant had left the Von's parking lot and

defendant's statements.  The trial court had defendant confer with counsel about a plea,

stated its intended sentence in the event defendant pled, then proceeded when defendant

---

[10] Defendant's complaints against both of his attorney were, for the most part, consistent throughout his three *Marsden* motions.  Essentially, there was nothing new in terms of defendant's dissatisfaction with his second deputy public defender by the time this case went to trial.

was silent in the face of the trial court's question whether defendant still wanted to go to trial. The time for trial to start the next day was announced and proceedings were adjourned. After the deliberating jury announced that it had reached verdicts, defense counsel informed the trial court that defendant wanted to address the court. Defendant personally requested a *Marsden* hearing. Although only two days had passed since defendant had told the calendaring judge that he wanted to represent himself, he did not mention this during the hearing on this motion. Defendant repeated the complaints he had made during all three of his *Marsden* motions brought against his second deputy public defender. In fact, during the hearing, defense counsel pointed out, "[W]e've litigated these exact points three times now." The trial court denied the motion, saying that there was nothing for defense counsel to do but take the verdict and if the jury had convicted defendant, he could bring a motion for a new trial based on his complaints about his attorney.

Less than a month later, the Public Defender's Office declared a conflict of interest in their representation of defendant, the office was relieved and a conflicts panel attorney was appointed to represent defendant. This attorney asserted, in her written motion for a new trial, "*It* also *appears from the caseprint* [*sic*] that [defendant] attempted to make a motion to represent himself . . . . It appears that the court declined to hear the Feretta [*sic*] motion. (Exhibit 1)" The exhibit counsel submitted in connection with the motion states for the date, April 11, 2011, in the trial courtroom, "Hearing on Motion Re: Faretta [¶] . . . [¶] On Court's own motion: Hearing off calendar issue was not discussed by defense or defendant. [¶] Motion granted." Although in her written

9

motion for a new trial, new counsel, inter alia, reasserted the often-asserted complaints about defendant's second deputy public defender, not once did she assert, as a basis for the granting of a new trial, that the trial court had failed to hold a hearing on defendant's request to represent himself or that his second deputy public defender had failed to ensure that the trial court knew that defendant wanted self-representation. The written motion also contained a declaration executed by defendant, but it did not address this issue.

During the hearing on this motion, new counsel pointed out that the minute order for April 11, 2011, for the trial judge's courtroom, contained the contradictory statements that defendant's *Faretta* motion had been taken off calendar on the trial court's own motion because it had not been discussed by either defendant or his attorney and that it had been granted. Of this, new defense counsel said, "[Defendant] did also bring up a *Faretta* motion in [the calendaring department] that then was continued to [the trial courtroom] on . . . April 11th. The minutes actually say the *Faretta* motion was granted and then it additionally says [']on the Court's own motion hearing is off calendar. Issue was not discussed by defense or defendant.[']" The trial court said it had no memory of this. Defendant's new counsel said, "I just wanted to bring to the [court's] attention and add to my argument [for] a motion for new trial that [defendant]'s rights were, again, I believe[,] violated, that he was doing everything he could to exercise his right to a *Faretta* motion because he was maintaining for several months that the [second deputy] public defender did not conduct a proper investigation, and he was using all legal efforts that he could to try to get that investigation going. The only way to do that would be to get a *Faretta* granted so he could get an investigator himself." However, counsel went on

10

to reassert the points she had made in her written motion about the deficiencies in representation by the second deputy public defender, both during his investigation of the case and during trial. The prosecutor responded to these, not mentioning the *Faretta* issue. Defense counsel offered a rebuttal, again avoiding the *Faretta* issue. The trial court denied the motion, also not mentioning that issue. Defense counsel did not further press the court.

Defendant here faults the trial court for failing to hold a hearing as to his second *Faretta* motion. As defendant asserts, we examine the entire record to determine if defendant knowingly and intelligently requested self representation. (*People v. Stanley* (2006) 39 Cal. 4th 913, 932 (*Stanley*).) We see no such request here, as defendant failed to make the trial court aware that he wanted to represent himself. Defendant, who demonstrated his lack of shyness in addressing the trial court time and time again, failed to assert at any point that he had asked the trial court to represent himself or that he had conveyed to his attorney that he still wanted to represent himself when he got before the trial court on April 11, 2011, including in his declaration attached to his motion for a new trial. The notation in the minute order of the trial court for that date saying that the matter had been taken off calendar because neither defendant nor counsel discussed the matter is supported by the record of the oral proceedings for that date. The trial court correctly observed, during the hearing on the motion for a new trial, that it did not recall such a motion because defendant *did not make one before the trial court*. Alternately, defendant criticizes defense counsel below for failing to point out to the trial court that defendant wanted to represent himself. Given this silent record, however, we can only

11

assume that, as with his first *Faretta* motion, brought less than a month before, defendant, in the hours between his statement in front of the calendaring judge and his appearance before the trial court, thought better of his request to represent himself and decided not to pursue it. (See *People v. Butler* (2009) 47 Cal.4th 814, 825 ["[T]he *Faretta* right may be waived by failure to make a timely request to act as one's own counsel [citation], or by abandonment and acquiescence in representation by counsel"]; *Stanley*, *supra*, 39 Cal 4th at p. 929 ["[I]n light of defendant's subsequent acceptance of several appointed counsel to represent him, . . . without renewing his request for self-representation, . . . he must be found to have ultimately waived or abandoned his asserted right of self-representation."].)

We part company with defendant in our conclusion that *People v. Skaggs* (1996) 44 Cal.App.4th 1, 8 is on point. Therein, during a *Marsden* motion, while expressing dissatisfaction with his lawyer, defendant said, "'I'd like to go pro per if I could.'" (*Id.* at p. 5.) The appellate court concluded that this was not a sufficiently unequivocal invocation to constitute a *Faretta* motion, saying, "The statement was made during a hearing on a motion to *substitute* counsel and was part of [the defendant's] explanation of the problems he was having with his appointed counsel. The comment was obviously aimed at impressing upon the court just how dissatisfied [the defendant] was with his present counsel. Further, the record clearly illustrates [that] the court [below] did not interpret [the defendant's] comments as a *Faretta* motion. The court repeatedly and consistently referred to the matter before [it] as a *Marsden* matter and nobody at the hearing disagreed with this characterization of the issue or made any statements

12

inconsistent with it. If [the defendant] intended to couple his express request for 'substitute counsel' with an alternative request to represent himself, *he did not communicate that intent to the court . . . .* [¶] . . . [¶] . . . The issue is . . . whether [the defendant] . . . in fact made [a *Faretta*] motion. We find that he did not because . . . [he] failed to unequivocally assert his right to self-representation. [¶] . . . [¶] . . . [I]f [the defendant] intended to assert his *Faretta* right, *he did not unequivocally communicate that intention to the court.* Under these circumstances, *the trial court has no sua sponte duty to inquire about defendant's intent when his purpose is not immediately clear. . . .* [¶] . . . If a *Faretta* motion was made, it was not ruled upon. By failing to request such a ruling and never raising the issue again, [the defendant] abandoned the motion he now claims he made." (*Id*. at pp. 5-8, italics added, fns. omitted.)

Also on point is *People v. Kenner* (1990) 223 Cal.App.3d 56, 62. Therein, after the defendant's *Marsden* motion was denied, he made a "timely and unequivocal" motion to represent himself. (*Id*. at p. 58.) At the defendant's request, a hearing on the motion was set for a later date. (*Ibid*.) The defendant did not appear on that date or on the next three court dates because he was in custody in another county. (*Ibid*.) During one of those dates, defense counsel told the court that the defendant was "'kind of concerned with trying to get . . . [a] retained attorney.'" (*Id*. at p. 59.) When the defendant did appear, his attorney reserved the motion "'we were in the [throes] of'" at the time defendant went into custody in the other county. (*Ibid*.) The court reset the matter for trial and confirmed the appointment of defense counsel. (*Ibid*.) The defendant did not mention his *Faretta* motion. (*Ibid*.) At a subsequent appearance, the defendant was

present when his attorney asked to continue a hearing on a motion. (*Ibid*.) The defendant personally waived time for trial, continued the motion and reset the trial date. (*Ibid*.) The defendant again did not mention his *Faretta* motion. (*Ibid*.) The defendant was present at three subsequent dates when various proceedings occurred, without mentioning his *Faretta* motion. (*Ibid*.) At a fourth proceeding, the court said it did not think it had to do anything else and the defendant remained silent. (*Ibid*.) This continued during the three days of trial. (*Ibid*.) In rejecting the defendant's contention that the trial court failed to rule on his *Faretta* motion, the appellate court held, "[T]he motion was not acted on due to the confusion caused by [the defendant]'s changing custody situation. Thus the case presents a stark judicial choice: *who should bear the burden of the omission—the trial court or the mysteriously silent defendant? By urging that the judgment must be reversed,* [*the defendant*] *would absolve himself of any vestige of responsibility. That position is not justified by either the law or the facts.* [¶] . . . [R]outinely, the right of self-representation is impliedly and silently waived. [¶] . . . [A] defendant's conduct may amount to a waiver or abandonment of the right of self-representation. . . . [A] waiver may be found if it reasonably appears from the conduct of the defendant that he has abandoned his request to represent himself. [Citation.] [¶] . . . [¶] The United States Supreme Court has . . . indicated that a waiver of the right of self-representation may be presumed from conduct. . . . [¶] . . . [¶] [The defendant] had ample opportunity to call the court's attention to the neglected *Faretta* motion, but did not. . . . [O]nce [the] defendant was returned . . . to [this c]ounty, his conduct throughout the proceedings indicated unequivocally that he agreed to and acquiesced in being represented by

14

counsel. . . . [¶] . . . [O]ur view . . . is simply that [the defendant] had second thoughts about the wisdom of representing himself and abandoned the idea. [¶] *Defendants who sincerely seek to represent themselves have a responsibility to speak up. The world of the trial court is busy and hectic, and it is to be expected that occasionally a court may omit to rule on a motion. When that happens, as here, we believe it is reasonable to require the defendant . . . to remind the court of the pending motion.*" (*Id.* at pp. 59-60, 62, italics added.)

What we find most telling in this case is the fact that, despite many opportunities to speak up, that continued to the time of his motion for a new trial, defendant never once asserted before the trial court that he wanted to represent himself or that he had communicated this intention to his trial counsel, who failed to convey it to the trial court.

Finally, as defendant, himself, concedes, a *Faretta* motion must be timely (*People v. Dent* (2003) 30 Cal.4th 213, 221) and this one, coming moments before trial began, was not.

3. *Jury Instruction on Flight*

The jury was given the following standard instruction, "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defendant now, for the first time, objects to this instruction, claiming there was no evidence to support it. We disagree. After defendant made three unsuccessful attempts

15

to obtain the items with checks and a Visa gift card, the cashier retained the second check and told defendant that he could not accept it as payment for the items. The identification defendant offered the cashier for the second check did not match the name on the check and the cashier indicated to defendant he realized this by shaking his head when defendant showed him the identification. Defendant's seeming inability to remove this identification from his wallet also suggested that he knew he had committed a crime. In short, defendant knew the jig was up. Like any reasonable person, he knew the cashier was not just going to let him walk away without calling the police. The jury could reasonably infer that that is why he left the store and then the parking lot. Therefore, there was evidence to support the giving of this instruction. Because of this, we cannot conclude that trial counsel for defendant was ineffective for failing to object to this instruction.

Defendant cites no authority holding that this instruction must be modified to caution the jury that leaving the scene is not flight unless the manner of leaving indicates a desire to avoid detection or arrest. If defendant wanted that clarification, he should have requested it. (*People v. Kelly* (2007) 42 Cal.4th 763, 790.) To the extent he faults trial counsel for failing to request this modification, he cannot prevail, as there is no reasonable probability, given the strength of the evidence against him, that he would have enjoyed a better outcome has such a modification in the instruction been made. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

16

4. *Convictions of Violating Both Sections 476 and 475, subdivision (c)*

It was the People's theory that defendant committed a violation of section 476 when he attempted to pass the second check and a violation of section 475, subdivision (c) when he possessed that check.

Defendant contends that he cannot stand convicted of both offenses because, as he correctly points out, all the offenses listed in sections 475, 476 and 470[11] have been named therein as constituting the crime of forgery. In support, he cites *Ryan, supra,* 138 Cal.App.4th 360. However, *Ryan* does not support his position.

Ryan was convicted of violating subdivision (a) of section 470 by signing another's name to a check and of violating subdivision (d) of section 470 by making or passing a forged check at a business. (*Ryan*, *supra*, 138 Cal.App.4th at pp. 362-364.) He claimed he could not stand convicted of violating both subdivisions.[12] The subdivisions of section 470 prohibit the signing of another's name to instruments listed in subdivision (d) (subd. (a)), the counterfeiting or forging of another's seal or handwriting on instruments listed in subdivision (d) (subd. (b)), the altering, corrupting or falsification of certain legal documents (subd. (c)) and the false making, altering, forging, counterfeiting, uttering, publishing, passing or attempting or offering to pass the instruments listed in subdivision (d) (subd. (d)). It is noteworthy that section 470 does not prohibit possession

---

[11] These provisions will be discussed in conjunction with the holding of *People v. Ryan* (2006) 138 Cal.App.4th 360 (*Ryan*), *infra*.

[12] Ryan was convicted of two counts of each because there were two checks, but for simplicity's sake, we will discuss only one check. (*Ryan*, *supra*, 138 Cal.App.4th at pp. 362-364.)

of any of the instruments it lists.  (§ 470, subds. (a)-(d).)  The *Ryan* court reasoned, "In construing . . . section 470, courts consistently held that there was but one crime of forgery, and that the various acts proscribed by the statute were simply different means of committing that offense.  For instance, in *People v. Frank* (1865) 28 Cal.507, 513, the California Supreme Court stated: ' . . . [E]ach of the[] acts [listed in 470] singly, or all together, if committed with reference to the same instrument, constitute but one offense. . . . '  [¶]  . . . [T]he doing of one or more of the proscribed acts, with respect to the same instrument, constitutes but one offense.  Thus, subdivisions (a) and (d) of [§ 470] do not describe separate offenses, but merely separate means of committing the same offense. . . .  [¶]  . . . [¶]  Under section 954, multiple convictions can be based on a single criminal act, unless one offense is necessarily included in the other.  [Citation.]  . . .  In . . . [*People v. Benavides* (2005) 35 Cal.4th 69 and other similar authorities], while the defendant may have committed a single act . . . , he or she was charged with, and convicted of, violations of *separate statutes*.  While each statute may represent *a different statement of the same offense*, it sets out a separate crime, not just—as in the case of section 470—alternative ways in which the *same crime* can be committed.  In the case before us, although [the defendant] arguably committed separate acts—signing the check[] and then uttering [it]—she did not, thereby, violate more than *one statute,* but simply committed acts contained in separate subdivisions of a *single statute*; all of which were simply different ways of violating *that statute*.  [¶]  . . .  [I]n *In re Horowitz* (1949) 33 Cal.2d 534, the defendant was charged with forgery and three other offenses when he wrote a will on a piece of paper that was blank except for his mother's signature . . . .

18

[T]he California Supreme Court rejected his argument that he was being improperly punished four times for one act. . . .  In none of [the] cases [the defendant cited in support of his argument] did the . . . information purport to charge, in addition to the [a violation of] 470 . . . , *another offense disparately defined and denounced by another code section.* [Citation.]  When . . . an indictment charged, in separate counts, violations of section 134 [(preparing a false will)] and section 470 . . . , it was held that 'Clearly, two separate offenses are set forth, and it is plain that each offense required proof of facts additional to those involved in the other . . . .'  [Citation.]  . . .  [¶]  . . .  [¶]  . . . '[*W*]*here one act . . . violates the provisions of two statutes, . . . it is punishable under both.*  [Citation.]' [¶]  . . . Under section 954, a defendant may be convicted of any number of different *offenses* charged."  (*Ryan*, *supra*, 138 Cal.App.4th at pp. 366-371, italics original and added, fn. omitted.)

Thus, *Ryan* teaches that when a defendant, as here, is charged with violations of separate statutes, even if they constitute "different statements of the same offense" convictions of violating those separate statutes are proper.  The only argument left to defendant is the fact that the crimes described in all four subdivisions of section 470, all three subdivisions of sections 475 and 476 are stated to be forgeries.  However, defendant cites no case holding that merely calling these offenses the same thing means that there is but one offense of forgery for which a defendant may be convicted, particularly, as here, where the various provisions are in *different statutes*.  If the Legislature intended such

treatment, it would have placed the offenses described in sections 475 and 476 in 470 and not in separate sections.[13]

**DISPOSITION**

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ            

P. J.

We concur:

HOLLENHORST      
            J.

KING          
            J.

---

[13] In *People v. Martinez* (2008) 161 Cal.App.4th 754, which defendant cites in his reply brief, the defendant was "charged . . . with . . . [¶] . . . two counts of . . . [¶] . . . forgery under . . . section 470, subdivision (d)." (*Id.* at p. 761.) He had forged the signature of the owner of property and of the notary who purportedly notarized the former's signature, both on a trust deed. (*Id.* at p. 756.) This court concluded, "[§ 470, subd. (d)] is violated each time a person makes and/or passes a forged *item*, no matter how many forged *signatures* are on the item. [¶] Our holding is limited to multiple convictions under . . . 470(d)." (*Id.* at pp. 762, 762, fn. 3.) Thus, *Martinez* has no application to this case, in which defendant was convicted of violating separate sections.

At oral argument, defendant called our attention to the following additional cases: *People v. Farell* (2002) 28 Cal.4th 381, *People v. Fenderson* (2010) 188 Cal.App.4th 625, *People v. Murdock* (1960) 183 Cal.App.2d 861, and *People v. Pierce* (1952) 110 Cal.App.2d 598. While these cases make the unremarkable observation that there are several types of theft (e.g., theft by embezzlement, theft by false pretenses), that are set forth in different sections of the Penal Code, none dealt with the issue raised here. Therefore, they are unhelpful to our discussion.

20
